**Raymond MAIER**

v.

**William PATTERSON et al.**

**Civ. A. No. 77–3635.**

United States District Court,
E. D. Pennsylvania.

March 25, 1981.

Harry S. Shargel, Milton S. Lazaroff, Philadelphia, Pa., for plaintiff.

Thomas W. Jennings, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

GILES, District Judge.

### I. BACKGROUND

This is an action for violation of the bill of rights for union members under 29 U.S.C. § 412, with pendent state tort claims. The defendants have moved for summary judgment.

Plaintiff Raymond Maier commenced this action on October 21, 1977. He claims that, on February 20, 1977, he sustained injuries when assaulted and battered by defendant William Patterson who was acting in his official capacity as business agent and trustee for the defendant union, Local 107 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Union"). Plaintiff alleges that the purpose of the physical assault was an attempt to take away his protected right of free speech and assembly and to otherwise discipline him for having exercised those rights. Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") title I, § 101, 29 U.S.C. § 411. Jurisdiction is asserted under LMRDA, §§ 102, 609, 29

U.S.C. §§ 412, 529. Compensatory and punitive damages are sought.

Specifically, Maier contends that he and other Union members, employees of the same employer, the Owens-Illinois Company ("OIC"), engaged in an official meeting with Patterson as their business agent to complain both about their employer and about Patterson's failure either to protect their job interests or to pursue their grievances with OIC. Several years earlier, employees of the same employer, including Maier, had made similar complaints of lack of representation and had petitioned for Patterson's removal as business agent.[1]

In the course of the meeting on February 20, 1977, and allegedly upon hearing Patterson state that a grievance could not be filed, Maier alleges he said to Patterson, "You don't do nothing for us anyhow," and further, "That's the trouble, Bill, you don't do nothing for us anyhow." Deposition of Raymond Maier, at 38–39. Patterson then responded angrily, "You ain't nothing but a shitstirrer. I don't like you anyhow." *Id.* 39. Maier countered, "I don't like you either." *Id.* Whereupon, Patterson allegedly ran around his desk saying, "I'll kill you, you little motherfucker." *Id.* He then allegedly grabbed Maier by the neck and head and pushed his head through the glass of a closed window. *Id.* 39–40.

Two days later, on February 22, 1977, Maier filed a complaint with the Federal Bureau of Investigation ("FBI"). Based upon its preliminary investigation, the FBI concluded that the physical assault appeared to be the result of a long-standing personal antagonism between Maier and Patterson rather than an antagonism generated by union connected matters. Hence, the FBI did not recommend to the United States Attorney criminal prosecution of the defendants.

Maier never filed an internal union grievance or charge against Patterson as a result of the incident, nor did the Union investigate the incident or take any action against Patterson in his official capacity. Following the incident, Maier continued to attend Union meetings and has been treated the same as all other Union members.

On November 15, 1978, defendants moved for summary judgment on the ground that the physical altercation was an isolated incident and no more than a personal incident between Maier and Patterson. They contend that it was certainly not discipline for protected activities imposed or caused by the Union within the meaning of "otherwise disciplined." LMRDA, § 101(a)(5), 29 U.S.C. § 411(a)(5). Defendants submit that, even assuming plaintiff could pass this first hurdle of proving there was discipline within the meaning of § 101(a)(5), the court should grant summary judgment for defendant because plaintiff has failed to exhaust any and all internal union remedies. Defendants further argue that, at worst, Patterson's conduct was solely private misconduct and that the Union itself cannot be held liable because it did not order, ratify, or participate in the assault and battery.

## II. EXHAUSTION OF INTERNAL UNION PROCEDURES

It is well established that whether a plaintiff will be required to utilize his internal union remedies is a matter within the discretion of the trial judge. *NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 428, 88 S.Ct. 1717, 1723, 20 L.Ed.2d 706 (1967); *Mallick v. IBEW*, 644 F.2d 228, 237 (3d Cir. 1981). The Third Circuit has recognized that under

---

1. Plaintiff has been a member of the Union since 1959 and had been employed as a truck driver for OIC since around 1972. He worked steadily for Owens-Illinois for a period of three years. Thereafter, he experienced intermittent layoffs due to a reduction in the workforce. He was subject to recall on an as needed basis in accordance with his company seniority. With this change in employment status, he became dissatisfied with his working conditions and with his Union representation. Part of his dissatisfaction stemmed from the fact that he believed the company was improperly using drivers from one of its subsidiaries to perform work he believed his bargaining unit should have performed. Although plaintiff testified he never filed a written grievance, he says he complained orally to his shop steward on a weekly basis about the loss of bargaining unit work.

certain circumstances it is particularly appropriate to waive the exhaustion provisions of LMRDA, § 101(a)(4), 29 U.S.C. § 411(a)(4), "[t]hat any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations and any officer thereof." Those circumstances include situations where the plaintiff will suffer irreparable harm in jobs or in rights guaranteed under the LMRDA, where it is found that preservation of the individual interest is more important than that of union autonomy, and where the internal union appeals structure is inadequate, illusory, or controlled by those to whom the plaintiff is opposed. Under such circumstances, exhaustion is deemed excusable or futile. *Semancik v. UMW, District # 5*, 466 F.2d 144, 150–51 (3d Cir. 1972). Exhaustion is deemed excusable where the union has consistently taken a position opposed to that of the plaintiff and makes no indication that it will alter its views. *Id.* 151; *Farowitz v. Associated Musicians, Local 802*, 330 F.2d 999, 1002–03 (2d Cir. 1964).

In assessing whether either of these circumstances is present here, an examination of the Union's by-laws demonstrates that now to require plaintiff to exhaust internal remedies would probably, or possibly, be to require a futile act.

 Section 20(A)(2) of the Union's by-laws states that "[u]nder no circumstances will a member have the right to have a hearing on charges based upon events occurring more than two (2) years prior to the filing of the charges." Inasmuch as the event giving rise to this lawsuit occurred more than three years ago, resort to the internal union procedures would be a futile act.[2] As has been stated in *Semancik*, the

exhaustion proviso of § 411(a)(4) is not mandatory in all cases. A plaintiff cannot be required to exhaust uncertain illusory, or inadequate internal union procedures. *Detroy v. American Guild of Variety Artists*, 286 F.2d 75, 80 (2d Cir.), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961). Moreover, a free speech violation generally justifies dispensing with the administrative remedies. *Semancik*, 466 F.2d at 150–51; *Keeffe Bros. v. Teamsters, Local No. 592*, 562 F.2d 298, 303 (4th Cir. 1977).

Even if resort to the internal union procedures were a viable alternative, it is by no means clear from a reading of the Union Constitution and by-laws that a remedy for compensatory and punitive damages against the defendants would be available.

Also present in this case is the suggestion of hostility by the very Union body which would at least initially review any charge by Maier. Patterson is not only a business agent and a trustee but is also a member of the Union's executive board. There has been no showing by the Union that Patterson would not participate in decisions of the executive board concerning Maier.

Separately, there is the suggestion of condonation of Patterson's actions. Following the altercation, Patterson reported his version of the incident to the executive board, but it never investigated the matter to ascertain either Maier's version or that of the other members who were party to the incident.[3]

Even though Maier alleges that Patterson tried to kill him in the Union offices concerning Union business, there was no internal investigation by the executive board.[4]

The lack of internal action suggests the possibility of condonation by the Union executive board sided with Patterson and accepted his version of the incident. This is particularly true where the alleged physical

---

**2.** Section 20(A)(2) further reads in pertinent part that:

> Charges shall not be processed unless the charging party files them within six (6) months after he learned, or in the exercise of due diligence should have learned, of the facts upon which the charges are based.

**3.** Patterson deposition transcript, February 3, 1978, N.T. 29–33.

**4.** *Id.* N.T. 32.

assault arose out of a meeting involving other members as well.

██ The assault could be interpreted as having the purpose of attempting to chill the right of free speech of those members, including Maier, to press their grievance concerns or to complain of Patterson's representation of them. *See Wood v. Dennis,* 489 F.2d 849, 855 (7th Cir. 1973) (*en banc*), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974).

██ A plaintiff is not compelled to exhaust internal union remedies when the appeal would have to be made to the very officers against whom the complaint is directed. *Calagaz v. Calhoon,* 309 F.2d 248, 260 (5th Cir. 1962); *Fulton Lodge No. 2, IAM,* 415 F.2d 212, 216 (5th Cir. 1969), *cert. denied,* 406 U.S. 946, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972); *see Bradford v. Textile Local 1093,* 563 F.2d 1138, 1141 (4th Cir. 1977). Here, of course, the charge would be received by the executive board, including Patterson.[5]

██ Plaintiff also argues that because the Union's internal procedures, even if viable, cannot award him punitive or compensatory damages, he should not be required to exhaust those procedures. Although a reading of the Union Constitution and by-laws supports plaintiff's factual contention that damages are not available via Union procedures, his legal conclusion is incorrect. The absence of an express damage remedy is insufficient reason to excuse exhaustion. *Winter v. Local 639, International Brother-*hood *of Teamsters,* 569 F.2d 146, 149 (D.C. Cir.1977).

██ Finally, the pleadings in this case show that the Union has consistently taken an official position in this case that the altercation was not in any way connected to official misconduct by Patterson. The Union has not given any indication of a willingness to change its position. *Verville v. International Association of Machinists,* 520 F.2d 615, 621 (6th Cir. 1975). Under all the circumstances, plaintiff shall not be required to exhaust internal union remedies.

## III. SUMMARY JUDGMENT

In considering a motion for summary judgment, the moving party has the burden of demonstrating that there is no genuine issue of fact as to any material fact and any doubt must be resolved in favor of the non-moving party. *Toebelman v. Missouri-Kansas Pipeline Co.,* 130 F.2d 1016, 1018 (3d Cir. 1942). It is the court's sole function to decide whether there is a genuine issue of fact to be tried. *Ettinger v. Johnson,* 556 F.2d 692, 696 (3d Cir. 1977); *Fairbanks, Morse & Co. v. Consolidated Fisheries Co.,* 190 F.2d 817, 824 (3d Cir. 1951).

### A. *Union Discipline*

The first substantive question we face is whether plaintiff, as a matter of law, was "otherwise disciplined" within the meaning of LMRDA § 101(a)(5), 29 U.S.C. § 411(a)(5) (1976).[6] Title I of the LMRDA gives a bill

---

**5.** Defendants and Patterson are represented by the same law firm.

**6.** For general discussion of § 101(a)(5), see, *e. g.,* T. Keeline, *NLRB and Judicial Control of Union Discipline* 47–85 (1976); Beaird & Player, *Union Discipline of its Membership Under Section 101(a)(5) of Landrum-Griffin: What is "Discipline" and How Much Process is Due?,* 9 Ga.L.Rev. 383 (1975); Etelson & Smith, *Union Discipline Under the Landrum-Griffin Act,* 82 Harv.L.Rev. 727 (1969); Comment, *Applicability of LMRDA Section 101(a)(5) to Union Interference with Employment Opportunities,* 114 U.Pa.L.Rev. 700 (1966) [hereinafter cited as 114 U.Pa.L.Rev.]; Annot., 43 A.L.R.Fed. 9 (1979). On the LMRDA, Title I, and its legislative history, see, *e. g.,* J. Bellace & A. Berkowitz, *The Landrum-Griffin Act* (1979); NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959* (1959) [hereinafter cited as *Legis. Hist.*]; Symposium on LMRDA (R. Slovenko ed. 1961); 13 *N.Y.U.Conf.Lab. (1960);* Aaron, *The Labor-Management Reporting and Disclosure Act of 1959* (pts. 1 & 2), 73 Harv.L.Rev. 851, 1086 (1960); Cox, *Internal Affairs of Labor Unions under the Labor Reform Act of 1959,* 58 Mich.L.Rev. 819 (1960); Murphy, *The Background of the Bill of Rights and Its Provisions,* in *Symposium, supra,* 277; Rothman, *Legislative History of the "Bill of Rights" for Union Members,* 45 Minn.L.Rev. 199 (1960). *See also* Comment, *Campaign Financing of Internal Union Elections,* 128 U.Pa. L.Rev. 1094 (1980) [hereinafter cited as 128 U.Pa.L.Rev.].

of rights to union members. Sections 101(a)(1)–(4) guarantee substantive rights, while section 101(a)(5) provides procedural safeguards against discipline. Because it is undisputed that those safeguards were not provided to plaintiff, the pivotal issue is whether defendant's actions constituted "discipline" triggering section 101(a)(5)'s procedural protections.[7]

Previous court interpretation of § 101(a)(5) indicates that "discipline" requires at least a detriment to a member placing him in a worse position than others in good standing. E. g., Miller v. Holden, 535 F.2d 912, 915 (5th Cir. 1976); T. Keeline, supra note 6, at 48–49. See also Morrissey v. National Maritime Union, 544 F.2d 19, 26 (2d Cir. 1976). When, however, the issue has been raised, the courts have held that some union actions meeting the above requirement are not "discipline"—additional tests must be met. In particular, the two district courts which have considered violence have concluded that it is not discipline.

In Green v. Local 705, Hotel & Restaurant Employees, 220 F.Supp. 505 (E.D.Mich. 1963), the complaint charged extortion, violence, and intimidation in connection with job referrals. The court held that this failed to state a claim under §§ 101(a)(5) and 102(a) because Title I should not be read "to usurp the appropriate criminal jurisdiction or applicable statutory prohibitions against illegal or unfair labor practices." Id. 507. Because this logic is questionable after International Brotherhood of Boilermakers v. Hardeman, 401 U.S. 233, 237–39, 91 S.Ct. 609, 612–614, 28 L.Ed.2d 10 (1971) (discipline arguably constituting unfair labor practice is not preempted by NLRA), we do not rely on Green. See Annot. 43 A.L.R.Fed. 9, 57–58 (1979).

In Murphy v. Operating Engineers Local 18, 99 L.R.R.M. 2074 (N.D.Ohio 1978), there were several violent episodes, including beating of a dissident union member within fifteen feet of a group of union executive-board members and business agents by two of that group. Id. 2086. See also id. 2087–88 (other beatings). After a thorough analysis of relevant appellate decisions, id. 2111–14, Judge Lambros held that although the violence was actionable as a violation of plaintiff's substantive rights under LMRDA § 101(a)(1) and (2), 29 U.S.C. § 411(a)(1) and (2), 99 L.R.R.M. at 2114–15, it was not "discipline" within the meaning of § 101(a)(5), 29 U.S.C. § 411(a)(5). 99 L.R.R.M. at 2115.

Judge Lambros relied primarily on the definition of discipline in Miller v. Holden, 535 F.2d 912 (5th Cir. 1976). In Miller, the plaintiff charged that he was fired from a position in the union's education trust in retaliation for supporting an unsuccessful candidate for union office. Id. 913. The Miller court held that this was not "discipline," announcing a two-part definition of "discipline":

> Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

Id. 915, quoted in Murphy, 99 L.R.R.M. at 2112; see 99 L.R.R.M. 2114 ("The Court finds the reasoning in Miller to be persuasive in the instant case and therefore adopts the definition of 'discipline' set forth therein.") Although the violence in Murphy met the second prong of the Miller test,

---

**7.** A determination that these actions are not "discipline" in no way affects other remedies plaintiff may have under the LMRDA, NLRA, or state law. E. g., Phillips v. International Ass'n of Bridge Workers, Local 118, 556 F.2d 939, 941–42 (9th Cir. 1977) (malicious prosecution not discipline, but might be interference with § 101(a)(4) right to sue); Murphy v. Operating Eng'rs, Local 18, 99 L.R.R.M. 2074, 2115 (N.D.Ohio 1978) (violence not "discipline," but was "interference" with § 101 substantive rights and therefore actionable under § 102). See LMRDA § 103, 29 U.S.C. § 413 (LMRDA doesn't preempt other state or federal remedies). See generally T. Keeline, supra note 6 at 9–46 (other federal remedies); id. 86–94 (state remedies); Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175 (1960).

it was not "under color of the union's right to control the member's conduct," and therefore was not discipline. 99 L.R.R.M. at 2115.

The *Murphy* holding drew strong support from *Phillips v. International Association of Bridge Workers, Local 118*, 556 F.2d 939 (9th Cir. 1977). *Phillips* had held that malicious prosecution of a civil suit by a union against a member was not "discipline." *Id.* 941–42. The grounds for that decision were that the member would be accorded procedural due process in the civil suit, *id.* 941, and that close analysis of the language of § 101(a)(5) "suggests that 'discipline' refers to punishment or adverse consequences that a union, operating through its own tribunal, can impose either by virtue of its relationship with or influence over the actions of the employer or potential employers of its members." *Id.* 941 (footnote omitted), *quoted in Murphy*, 99 L.R.R.M. at 2113. Because violence is not imposed by virtue of a union's authority over members or its relationship with employers, it is not discipline under the *Phillips* test.

We would be inclined to follow *Murphy's* thorough analysis without further ado, except that the Third Circuit has not decided this issue, and other authority could lead to the result that the violence in this case can be discipline. Particularly troubling is the line of analysis holding that punitive union action is "discipline" if it is intended to interfere with the substantive rights granted by LMRDA § 101(a)(1)–(4), 29 U.S.C. § 411(a)(1)–(4).

In *Bradford v. Textile Workers Local 1093*, 563 F.2d 1138 (4th Cir. 1977), plaintiff was removed from a union office, allegedly without notice of charges or notice of hearing. *Id.* 1139–40. Plaintiff alleged that this action was in retaliation for exercise of his § 101(a)(1) right to free speech. The court held that this comprised discipline within the meaning of LMRDA § 609, 29 U.S.C. § 529:

The very phraseology of the term itself "*otherwise discipline*," manifests the legislative purpose to give a broad and liberal construction to the term, and one which certainly would comprehend anything in the nature of retaliation for the exercise of free speech in "intra-union political" affairs.

*Id.* 1142 (footnote omitted) (emphasis added by *Bradford* court) (citing *Morrissey v. National Maritime Union*, 544 F.2d 19, 26 (2d Cir. 1976)). Although *Bradford* does not in terms apply to § 101(a)(5),[8] the Fourth Circuit's logic seems to apply equally well to that section. If applied in the instant case, *Bradford* implies that the violence would be a violation of § 101(a)(5) if plaintiff could prove his allegation that defendant acted in retaliation for exercise of Title I substantive rights.

This position may find support in the district courts of this circuit. In *DeCampli v. Greeley*, 293 F.Supp. 746 (D.N.J.1968), the court found in favor of a union business agent who had been discharged in retaliation for exercise of Title I rights. In *Grove v. Glass Bottle Blowers Association*, 329 F.Supp. 337 (W.D.Pa.1971), the court held that removal from union office did not trigger the procedural protections of § 101(a)(5). In reaching this position, Judge Weber distinguished *DeCampli* on the basis that the discharge in *DeCampli* was in reprisal for exercise of free-speech rights. *See* 329 F.Supp. at 338–39; 293 F.Supp. at 749. The implication is that an action which is not "discipline" can be converted to discipline by the actor's retaliatory intent.

Because of this conflict of authority, we undertake our own analysis. We start, of course, with the language of the statute. *E. g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979); *Mountain Brook Orchards, Inc. v. Marshall*, 640 F.2d 454, 456 (3d Cir. 1981).

**8.** The *Bradford* case did not present the Fourth Circuit with the precise issues we face here. In *Bradford*, the trial judge had directed a verdict for defendants on plaintiff's § 101(a)(5) procedural claim. Defendants appealed from a subsequent jury verdict for plaintiffs under § 609. 563 F.2d 1140.

444

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

LMRDA § 101(a)(5), 29 U.S.C. § 411(a)(5). By the principle of *ejusdem generis*,[9] the general expression "otherwise disciplined" connotes action similar to the specific acts of fining, suspending, or expelling. What these specific acts have in common is that they stem from the peculiar authority of the union over its members. *See Miller*, 535 F.2d at 914–15. Furthermore, the specific acts plainly constitute discipline regardless of the union's motivations.[10]

■■■ Thus, ordinary principles of statutory construction imply that "otherwise disciplined," like the preceding words, "fined, suspended, expelled," does not depend on the union's motivation, but requires an exercise of the authority acquired by virtue of the employee's membership in the union. This authority can spring purely from the power that any organization has over its members—the union-member relationship, e. g., *Martire v. Laborers' Local 1058*, 410 F.2d 32, 35 (3d Cir.), *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *see also Mallick v. IBEW*, 644 F.2d 228 at 230, 236 (3d Cir. 1981) (fines and official disciplinary charges), or can be augmented by the power unions acquire by

virtue of their special place in federal law as exclusive bargaining agents. NLRA § 9(a), 29 U.S.C. § 159(a). Based on the latter source of power, union interference with employment opportunities can constitute discipline. *See Detroy v. American Guild of Variety Artists*, 286 F.2d 75 (2d Cir.), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961).

Although a close examination of the statute tends to show that violence ordinarily is not "discipline," our analysis does not end here. We shall examine Congress' intent as contained in the legislative history to see if it supports my reading of the statutory language. We also are mindful of Professor Cox's admonition that:

The legislation contains more than its share of problems for judicial interpretation because much of the bill was written on the floor of the Senate or House of Representatives and because many sections contain calculated ambiguities or political compromises essential to secure a majority. Consequently, in resolving them the courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words.[11]

Because of the unusual manner of adoption of Title I, there is a minimum of authoritative Congressional guidance. *See, e. g., Fulton Lodge No. 2, IAM v. Nix*, 415 F.2d 212, 217 & nn. 12–13 (5th Cir. 1969), *cert. denied*, 406 U.S. 946, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972). Title I was introduced

**9.** *Ejusdem generis* (literally "of the same kind") is the principle of statutory interpretation that "[w]here general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A C. Sands, *Statutes and Statutory Construction* § 47.17 (4th ed. 1973). Furthermore, "the general words will not include any objects of a class superior to that designated by the specific words." *Id.* § 47.19. *See generally id.* § 47.17–22.

**10.** This is evident from the face of the statute, which imposes no motive or intent requirement. This per se rule is explained by one set of commentators as follows:

"The motive for the union's action is irrelevant under section 101(a)(5). The purpose of the section is 'to provide procedural safeguards to union members when an action taken against them would result in the loss of some valuable membership right, monetary or otherwise.'"
J. Bellace & A. Berkowitz, *supra* note 6, at 68–69 (quoting Pittman v. United Bhd. of Carpenters, 251 F.Supp. 323, 324 (M.D.Fla.1966)).

**11.** Cox, *supra*, note 6 at 852, *quoted in, e. g., Hall v. Cole*, 412 U.S. 1, 11 n.17, 93 S.Ct. 1943, 1949 n.17, 36 L.Ed.2d 702 (1973); Brennan v. United Steelworkers, 554 F.2d 586, 593 (3d Cir. 1977). *See also* 128 U.Pa.L.Rev. at 1102 & nn. 45–46.

as an amendment on the Senate floor, adopted by one vote, and later spontaneously modified.[12] Thus, we cannot turn to a report of a committee that had given § 101(a)(5) careful scrutiny before introduction. The post-adoption committee reports are ambiguous on the question before us; the section-by-section analyses merely paraphrase § 101(a)(5), *e. g.,* H.R.Rep.No.741, 86th Cong., 1st Sess. 788 (1959), *reprinted in* [1959] U.S.Code Cong. & Ad.News 2424, 2453, *also reprinted in* I *Legis. Hist., supra* note 6, at 788, and reveal only a general purpose of fostering internal union democracy. *See, e. g.,* 128 U.Pa.L.Rev. at 1102–03. This language is too vague to be helpful.

The floor debate on § 101(a)(5) concentrated on the issues of what process was due, and whether the section required notice and hearing before removing a corrupt union official from office. Some discussion, however, illuminates the issue before us.

On the Senate floor, inquiring about § 101(a)(6) of the McClellan amendment, which with modifications became § 101(a)(5) of the LMRDA, Senator Clark asked if a ten-dollar fine for being drunk and bringing the union into disrepute would invoke the procedural safeguards against improper discipline. Senator McClellan, the author of the bill of rights for union members, replied that more than a ten-dollar fine was involved "if union officials can expel a member from the lodge and keep him from working.... What we are trying to do is to protect a man from being arbitrarily disciplined without a fair hearing and without the right to protect his livelihood." 105 Cong.Rec. 6477 (1959), *reprinted in* II *Legis. Hist.* at 1103. Shortly thereafter, as preface to discussing the vagueness of charges which had led to discipline, Senator McClellan stated:

> The material which I am about to read ... states that good standing in a union can be lost for a variety of reasons.... The report states: "Good standing in a union can be lost for a variety of reasons so broad or vague and uncertain as to be subject to abuse and discriminatory application."

*Id.* 6477–78, *reprinted in* II *Legis. Hist.* at 1104 (citing 1959 CCH Labor Research Report).

The author of what became § 101(a)(5) thus explained to the Senate that "discipline" comprised expulsion, keeping a member from working, attacking his livelihood, or taking away his good standing. *Accord id.* 15834, *reprinted in* II *Legis. Hist.* at 1666 (remarks of Rep. Rhodes) (Section 101(a)(5) allows union member to "protect the job he has, protect his craft or his skill in the craft which he has acquired through the years. He cannot be suspended or expelled, and deprived of his right to make a living, without first being given a hearing."). The Congressional intent, as evidenced by these remarks, supports the holding of *Phillips,* that discipline is a detriment imposed by virtue of a union's authority over its members, or relationship with employers.

Nothing in either committee reports or floor debates indicates that violence could be "discipline." Certainly, Congress was concerned with violence in labor unions, and this concern is mentioned in reports and on the floor, but whenever discussion of violence in retaliation for exercise of substantive rights is juxtaposed with mention of procedural protection against discipline, the violence is only said to be an interference with substantive rights.

Senator McClellan's proposed § 101(a)(2) would have allowed a union member freedom of speech "without being subject to penalty, discipline, or interference of any kind by such organization." *Id.* 6475, *reprinted in* II *Legis. Hist.* at 1102. This wording shows that there are kinds of "interference" with freedom of speech that do not constitute "discipline." In the initial debate on this section, Senator McClellan first reads the provision, and then interpolates a reference to § 101(a)(5). He then

---

12. *See generally* International Bhd. of Boilermakers v. Hardeman, 401 U.S. 233, 243, 91 S.Ct. 609, 615, 28 L.Ed.2d 10 (1971); *Miller,* 535 F.2d at 914 n.5; J. Bellace & A. Berkowitz, *supra* note 6, at 1–8; Rothman, *supra* note 6; 128 U.Pa.L.Rev., at 1118–19.

resumes his discussion of § 101(a)(2), asking: "Are union members ever *interfered* with?", answering "yes," and using intimidation of free-speech rights by "thugs and hoodlums as an example of *interference.*" Thus, impeding the exercise of Title I substantive rights by intimidation was thought to be "interference," not "discipline," and was actionable as a violation of the substantive right, rather than as a violation of due process. *See id.* 6482–83, *reprinted in* II *Legis. Hist.* at 1109 (remarks of Senator Kennedy) (after discussing due process rights, discusses free speech rights, using goons unmercifully beating member in retaliation for speech at meeting as example of violation of § 101(a)(2)).

 Therefore, relying on normal principles of statutory interpretation, and on the legislative history, we hold that Congress intended that "otherwise disciplined" in LMRDA § 101(a)(5), 29 U.S.C. § 411(a)(5) refer only to detriments that a union undertakes through its authority over members. This conclusion is bolstered because it provides a simple, unitary explanation of other cases dealing with § 101(a)(5).

In a variety of situations not involving violence, courts have provided a variety of explanations why some union activity allegedly retaliating for exercise of substantive rights was not "discipline." *E. g., Phillips v. International Association of Bridge Workers, Local 118*, 556 F.2d 939, 941–42 (9th Cir. 1977) (malicious prosecution not discipline because not imposed by virtue of union's authority over member's relationship with employers, and because member would receive procedural protection in the maliciously prosecuted action); *Morrissey v. National Maritime Union*, 544 F.2d 19, 26 (2d Cir. 1976) (arrest of union member and removal from union's premises by police not discipline because compliance with 101(a)(5) unfeasible and member would have judicial procedural protection from trespass prosecution). These cases might be explained by creating a series of special-purpose exceptions to the definition of "disciplined." For instance, one might derive a rule that action is not discipline if the member can receive due process later, or if compliance with procedural safeguards is "unfeasible." It is, however, simpler and preferable to view these cases as examples of the rule which we have restated here—that there was no discipline because there was no exercise of a power acquired by virtue of the union-member relationship.

### B. *Free Speech*

 The holding that plaintiff was not "disciplined" does not necessarily mean that defendants are entitled to summary judgment. An action that is not discipline within the meaning of § 101(a)(5) may, nonetheless, be actionable under § 102 as a violation of another Title I substantive right. *Murphy v. Operating Engineers, Local 18*, 99 L.R.R.M. 2074, 2115 (N.D.Ohio 1978). *See also* note 7 *supra.*

 An assault and battery by a union representative upon a union member engaged in expression of views on a subject cognizable within the business of the union does provide the basis for a proper claim under 29 U.S.C. §§ 411(a)(1)-(2), 412. *See Tomko v. Hilbert*, 288 F.2d 625, 626 (3d Cir. 1961); *United States v. Roganovich*, 318 F.2d 167 (7th Cir.), *cert. denied*, 375 U.S. 911, 84 S.Ct. 206, 11 L.Ed.2d 150 (1963); *United States v. Bertucci*, 333 F.2d 292 (3d Cir.), *cert. denied*, 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964); *Fulton Lodge No. 2, IAM v. Nix*, 415 F.2d 212 (5th Cir. 1969).

In *Roganovich*, for example, an appeal from a criminal conviction for violation of 29 U.S.C. §§ 411(a)(1)-(2) and 530, a member at a union meeting had been speaking from the floor of the union meeting criticizing the report of a business agent. The agent walked over to the member and asked if he was calling him a liar. As several other union members approached the plaintiff, the agent backed away and watched the others beat plaintiff with their fists. Under those circumstances, the district court found that the evidence was capable of showing either reprisal by the business agent or an attempt to prohibit him from exercising the right of free speech, and the finding was sustained by the circuit court. 318 F.2d at 170–71.

In *Murphy*, the plaintiff was sitting near in a hotel bar after speaking at a union executive-board meeting in the hotel. A group of executive-board members and business agents sat nearby. Two members of that group attacked the plaintiff, knocking him to the ground, punching and kicking him. 99 L.R.R.M. at 2086. Although the district court found that this conduct did not constitute discipline, *id.* 2115, it found that the union had violated LMRDA § 101(a)(1)–(2), 29 U.S.C. § 411(a)(1)–(2), "by infringing upon plaintiff's right to participate in intra-union political activities without fear of reprisal from incumbent political officers." *Id.* 2114 (citations omitted).

Here, the evidence is capable of a finding by the trier of fact that the physical assault by Patterson was indeed a reprisal for Maier's criticism of his lack of effective Union representation and an attempt to punish Maier for having previously participated in executing and circulating a petition for his removal. Maier was regarded by Patterson as a "shitstirrer," a noun which may possibly be construed by the jury as descriptive of a disgruntled agitator.

▪▪▪▪ In the FBI Report, incorporated into defendants' motion for summary judgment, some further support is given for the position that Patterson's antagonism was possibly related to the earlier removal petition and extended to all Union members signatory thereto. It reads:

> ___ went to Local 107 that afternoon with ___ to see Patterson. In the office with Patterson was Tom O'Malley, another Business Agent. They told Patterson that they had a grievance and explained it. Patterson handed ___ a petition to remove Patterson as Business Agent for OIC which ___ had signed and asked, 'Is that your signature on the petition?' ___ replied 'Yes, it is.' Patterson asked, 'How come you signed it?' ___ answered, 'Because you're not representing me.' Patterson grabbed the petition and said, 'Oh, I'll fix your ass.' ___ said, 'What

are you doing, threatening me?' ___ Patterson said, 'No, I'm sorry I didn't mean that.'

FBI Report at 53, (deletions in original). The foregoing discussion, in conjunction with this background, makes it impossible at this stage to find that Patterson's alleged antagonism extended solely to Maier, was unrelated to the prior removal petition, and was in all respects unrelated either to Union matters or an attempt to control or interfere with the protected rights of Maier and the other union members. Therefore, this court finds that there is a genuine issue of material fact whether plaintiff's free-speech rights were violated.[13]

### IV. *CONCLUSION*

For the above reasons, defendant's motion for summary judgment is denied on the grounds that there are disputed issues of material and plaintiff has shown cause to be excused from the requirement, discretionary with the court, of exhausting internal union remedies.

---

**13.** Therefore there is subject matter jurisdiction under 29 U.S.C. §§ 411(a)(1), (2) and (5) and 529. See Vandeventer v. Local No. 513, 579 F.2d 1373, 1378 (8th Cir. 1978).