**UNITED STATES of America, Plaintiff,**

v.

**LOCAL 560, etc. et al., Defendants.**

Civ. No. 82–689.

United States District Court,
D. New Jersey.

Nov. 1, 1982.

U.S. Dept. of Justice by Thomas Weisenbeck, Sp. Atty., Newark, N.J., for plaintiff.

**512**

Schneider, Cohen, Solomon & DiMarzio by Edward Cohen, Paul Montalbano, Jersey City, N.J., for defendant, Local 560.

Brenner, New & Brenner by Herbert New, Livingston, N.J., for defendant, Trucking Employees of New Jersey Welfare Fund.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This civil action brought pursuant to the Racketeer Influence and Corrupt Organizations Act (RICO)[1] presents a question of first impression. The United States charges that Local 560 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, (Local 560), together with its Welfare and Pension Funds (Funds) and its Severance Pay Plan, (Plan), is a "captive labor organization."[2] It principally seeks an order placing Local 560 under a trusteeship, divesting the individual defendants of their interests in the union, and prohibiting their future involvement in the union's affairs. Local 560, the Funds and the Plan are named in the complaint as nominal defendants and referred to collectively as the "Local 560 Enterprise." Also named as defendants are the current members of the Executive Board of Local 560: Salvatore Provenzano,

Joseph Sheridan, Josephine Provenzano Septembre, J.W. Dildine, Thomas Reynolds, Sr., Michael Sciarra and Stanley Jaronko; the trustees and administrators of the Plan: Salvatore Provenzano and Josephine Provenzano Septembre; the employee trustees of the Funds: Salvatore Provenzano and Thomas Reynolds, Sr.; and the following individuals: Anthony Provenzano, Nunzio Provenzano, Stephen Andretta, Thomas Andretta and Gabriel Briguglio. The government with this court's consent has entered into stipulations of settlement with Anthony Provenzano[3] and Nunzio Provenzano.[4]

The complaint alleges that the Local 560 Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).[5] It further charges that the named individuals are associated under the leadership of defendant Anthony Provenzano, (Provenzano Group), which group allegedly unlawfully conspired, in violation of 18 U.S.C. § 1962(d), to violate and actually did violate 18 U.S.C. § 1962(b) and (c).

The case is presently before me[6] on the motion of Local 560 pursuant to Fed.R. Civ.P. 12(b)(6) to dismiss paragraph 12(a) of the complaint for failure to set forth a cause of action. A complaint may only be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) if, accepting the factual allegations of the complaint as true, it appears beyond a doubt that the plaintiff can prove no set of

1. Chapter 96 of Title 18, 18 U.S.C. §§ 1961–1968, was added to that title by Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 941.

2. The Fund and Plan have been merged and split several times, the two most recent events being the March 1, 1974 separation of Locals 617 and 641 from the Trucking Employees of North Jersey Welfare Fund (and Pension Plan) and the May 4, 1977 merger of the North Jersey Fund and Plan with that of the Trucking Employees of Passaic and Bergen Counties.

3. A consent order was entered by this court on June 15, 1982 approving of the terms agreed upon by the United States and defendant Anthony Provenzano. That order stated, *inter alia*—

The defendant be and is hereby permanently enjoined and prohibited from any form of association with any enterprise (within the meaning of Section 1961 of Title 18 of the United States Code), which enterprise seeks,

directly or indirectly, to dominate, control, conduct or otherwise influence the affairs of any labor organization or any employee benefit plan (within the meaning of Title 29 of the United States Code).

4. A similar consent order was entered on September 15, 1982 approving of the terms agreed upon by the United States and Nunzio Provenzano.

5. 18 U.S.C. § 1961(4) provides:

"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

6. Subparagraphs 12(a)(26), (27) and (28) were added to the complaint upon application by the plaintiff for leave to file an amended complaint pursuant to Fed.R.Civ.P. 15(a) granted on September 20, 1982.

facts which would entitle him to relief. *Jamieson v. Robinson,* 641 F.2d 138 (3d Cir. 1981). For the reasons which follow, I am denying the defendant's motion to dismiss.

In order to understand the thrust of the defendant's motion, it is necessary to outline the structure of this complaint in some detail prior to summarizing the arguments raised in the moving papers.

The government alleges in paragraph 12(a) that defendant Anthony Provenzano and other defendants either associated with the Provenzano Group or aiding and abetting the same, violated section 1962(b) of RICO.[7] Section 1962(b) provides in pertinent part:

> It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce.

"Pattern of racketeering activity" is defined as at least two acts of racketeering activity, within a period of ten years (excluding any period of imprisonment), one of which has to have occurred after the effective date of the Act. 18 U.S.C. § 1961(5). RICO defines "racketeering activity" by reference to certain crimes chargeable under state law and to certain indictable offenses under federal law. 18 U.S.C. § 1961(1).[8]

Paragraph 12(a) charges the "predicate"[9] offenses of murder and Hobbs Act extortion, 18 U.S.C. § 1951, as the pattern through which the defendants unlawfully acquired and maintained a controlling interest in the Local 560 Enterprise. Specifically, the property which is alleged to have been systematically extorted was "in the form of [the members'] union rights as guaranteed by the provisions of sections 157[10] and 411 of Title 29."

The union rights guaranteed by section 411 were enacted as Title I of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 411 *et seq.,* and referred to as the "Bill of Rights of

---

**7.** The complaint also alleges in paragraph 12(b) that the defendants violated 18 U.S.C. § 1962(c) of RICO. That portion is not at issue in this motion.

**8.** 18 U.S.C. § 1961(1) provides:

"Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to un-

lawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;

**9.** The statute which satisfies the "racketeering activity" element is commonly called the predicate offense.

**10.** 29 U.S.C. § 157 is section 7 of the Taft-Hartley Act. Defendant notes in its brief that the plaintiff appears to have foregone reliance upon it. In *United States v. Boffa,* 688 F.2d 919 (3d Cir.1982), as discussed *infra,* the reliance on that provision as the source of intangible rights under the mail fraud statute was overturned.

Members of Labor Organizations." [11] Its emphasis is

> on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood.

11. 29 U.S.C. § 411 provides:

(a)(1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

(3) Dues, initiation fees, and assessments.—Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization

*Finnegan v. Leu,* —— U.S. ——, ——, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). The provision which ultimately was enacted as Title I was introduced as a floor amendment by Senator McClellan to the Kennedy-Ervin bill, S.1555. 105 Cong.Rec. 5810 (daily ed., Apr. 22, 1959) II NLRB, Legislative

held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization: *Provided,* That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization.

(4) Protection of the right to sue.—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

(5) Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

History of the Labor-Management Reporting and Disclosure Act of 1959 (hereinafter Legis.Hist.) 1102. Senator McClellan believed that

> ... we ought to start with the union man, with the worker, and to relieve him from the oppression which has been thrust upon him in some places. We should restore to him his rights. We should vest in him again the power to do something to protect his rights. We must give him the authority again to run his own union. We must pass a law, such as the measure now proposed, which will enable him to prevent usurpation by would-be exploiters. Let us start to help the worker.

105 Cong.Rec. 5813 (daily ed. Apr. 22, 1959), II Legis.Hist. 1105. The amendment passed by a slim margin of 47 to 46. 105 Cong.Rec. 5827 (daily ed. Apr. 22, 1959) II Legis.Hist. 1119. *See generally United Steelworkers of America v. Sadlowski*, —— U.S. ——, ——, 102 S.Ct. 2339, 2342, 72 L.Ed.2d 707 (1982).

The particular acts of the defendants which allegedly created the climate of intimidation which in turn induced the surrender of the members' rights are included as subparagraphs (1) through (28) of paragraph 12(a). The specific acts alleged, are: (1) the June 1961 murder of Anthony Castellitto; (2) the August 1961 appointment of Salvatore Provenzano to the position of Trustee formerly occupied by Castellitto; (3) the September 1961 appointment of Salvatore Briguglio—the alleged murderer of Castellitto—to the position of Business Agent; (4) the February 1963 appointment of Nunzio Provenzano to the position of Business Agent following his January 1963 conviction for extortion; (5) the May 1963 murder of Walter Glockner; (6) the 1964 appointment of Robert A. Luizzi to the position of Business Agent in spite of a record of criminal convictions; (7) the May 1967 appointment of Luizzi to the position of Trustee; (8) the February 1969 appointment of Salvatore Briguglio to position of Business Agent following completion of a term of imprisonment for extortion; (9) the April 1969 appointment of Nunzio Provenzano to the position of clerk following completion of a term of imprisonment for extortion; (10) the 1970 appointment of Nunzio Provenzano to the position of Business Agent; (11) the 1971 appointment of Thomas Reynolds, Sr. to the position of Business Agent in spite of a record of criminal activity; (12) the 1972 appointment of Nunzio Provenzano to the position of Fund Trustee; (13) the 1972 appointment of Salvatore Briguglio to the position of Fund Trustee; (14) the allowance of frequent visitations by Armand Faugno and Thomas Andretta to the offices of Local 560; (15) the January 1963 appointment of Nunzio Provenzano to the position of Secretary-Treasurer; (16) the 1973 appointment of Reynolds to the position of Fund Trustee; (17) the 1974 resumption of duties as Business Agent by Salvatore Briguglio following completion of a term of imprisonment for counterfeiting; (18) the 1974 appointment of Luizzi to the position of Fund Trustee; (19) the November 1975 appointments of Anthony and Nunzio Provenzano to the positions of Secretary-Treasurer and President, respectively, in spite of a record of convictions for extortion; (20) the February 1977 appointment of Reynolds to the position of Trustee; (21) the July 1978 appointment of Josephine Provenzano Septembre to the position of Secretary-Treasurer following Anthony Provenzano's conviction for the Castellitto murder; (22) the July 1981 appointment of Salvatore Provenzano to the position of President following Nunzio Provenzano's forced resignation as a condition of bail on a labor racketeering conviction; (23) the Executive Board's failure to recover monies wrongfully converted by Anthony Provenzano; (24) the retention of Marvin Zalk as Fund Administrator in spite of payments accepted by him from an insurance company representative during the 1950's; (25) the retention of Ralph Torraco as the Fund's independent certified public accountant in spite of his federal indictment for systematically overbilling the Fund; (26) the extortion of contributions to the defense funds of the Provenzanos and Michael Sciarra from union members; (27) the 1981 appointment of Luizzi to the position

of Business Agent; and (28) associations by some of the defendants with Frank "Funzi" Tieri and Matteo Alfredo Ianniello, reputed organized crime members.

Defendant Local 560 in moving to dismiss paragraph 12(a) contends that the rights guaranteed by section 411 are not "property" extortable under the Hobbs Act. The argument is premised on two propositions, the correctness of either of which will entitle the defendant to the dismissal of this portion of the complaint: first, that the concept of "property" under the Hobbs Act does not embrace the rights created under section 101 of the LMRDA; and second, to the extent that these rights are extortable, that the LMRDA provides the exclusive criminal sanction for such a violation. *See* 29 U.S.C. § 530.[12]

The government argues that section 610 of the LMRDA is not the exclusive remedy for extortionate taking of section 411 rights. The LMRDA, it contends, neither expressly nor impliedly repealed the Hobbs Act's application to conduct which might also violate sections of the LMRDA because Congress did not intend the LMRDA to be exclusive. The government further submits that section 530 does not prohibit the conduct alleged in the complaint because it is essentially an assault and battery statute.

A review of some of the history preceding the enactment of the Hobbs Act and the LMRDA will be helpful for an understanding of the issues raised in this motion. The precursor to the Hobbs Act was the Anti-Racketeering Act of 1934. It was designed to penalize extortion and racketeering and to protect commerce against interference by threats and violence. Annot., 4 A.L.R.Fed. 881, 890 (1970). In 1942, the Supreme Court narrowly construed the provisions of the Anti-Racketeering Act to exclude from its extortion coverage certain labor activities. Congress thereafter enacted the Hobbs Act in reaction to that decision in order to implement its intentions to curb labor racketeering. While aimed at labor racketeering, its broad terms cover a field comparable to existing state extortion statutes. *See generally United States v. Harding,* 563 F.2d 299, 302–04 (6th Cir.1977) *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978).

The LMRDA, in addition to the Bill of Rights of Title I discussed earlier, contained five titles designed primarily to achieve internal union democracy with one additional title covering amendments to the Taft-Hartley Act. It included comprehensive reporting requirements, 29 U.S.C. §§ 431–41; regulation of the imposition of trusteeships over subordinate labor organizations, 29 U.S.C. §§ 461–66; the establishment of election procedures, 29 U.S.C. §§ 481–83; safeguards in the form of fiduciary standards and responsibilities for officers, 29 U.S.C. §§ 501–04; and numerous civil, administrative, and criminal enforcement provisions. The congressional debate centered primarily upon the Taft-Hartley Amendments. For a discussion of the controversy surrounding its passage, see ABA, *The Developing Labor Law,* 49–59 (1971).

In analyzing the interplay between the Hobbs Act and the LMRDA, I take guidance from the recent opinion of the Third Circuit Court of Appeals in *United States v. Boffa,* 688 F.2d 919 (1982). In *Boffa,* this Circuit found, on the one hand, that the RICO predicate act of mail fraud, 18 U.S.C. § 1341, may encompass a scheme to deprive union members of the right to the honest and faithful services of union officials provided in section 501 of the LMRDA, 29

---

**12.** 29 U.S.C. § 530 entitled "Deprivation of Rights by violence; penalty" provides:

It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this chapter. Any person who willfully violates this section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

29 U.S.C. § 529 makes it unlawful for any labor organization, officer or employee to "fine, suspend, expel, or otherwise discipline" a member for exercising any rights granted under the LMRDA. The remedy provided is a civil one.

U.S.C. § 501, but may not, on the other hand, encompass a scheme to deprive employees of rights created by section 7 of the National Labor Relations Act (NLRA) 29 U.S.C. § 157. The dichotomy of treatment given these statutes is instructive.

In *Boffa* the defendants Eugene Boffa, Sr., Robert Boffa, Sr., and Chandler Lemon who operated labor leasing businesses switched labor leasing contracts they had with certain facilities from corporations they controlled to others ostensibly independent but which they also controlled for the purpose of lowering wages paid and/or increasing fees charged. The defendants assured themselves of the cooperation of defendant Francis Sheeran who was the president of the local Teamsters union which represented some of the leased drivers by delivering money or some other thing of value to him in violation of the Taft-Hartley Act, 29 U.S.C. § 186(a)(4). The mailing of the notices of termination to the employee drivers in furtherance of the scheme formed the basis of the mail fraud indictments. At 924–925.

In examining the contentions of the appellants that the labor switches were, at most, unfair labor practices, the Third Circuit first reviewed the statutory coverage of the mail fraud statute to find that in general "a scheme to deprive persons of intangible rights or interests may be within the ambit of 18 U.S.C. § 1341." *Id.* at 927. However, in order to discern whether any federal statute in particular can serve as the source of an intangible right in a mail fraud prosecution, the court examined the language and legislative history of the federal statute. Chief Judge Seitz stated

> As a matter of statutory construction we are unwilling to sanction mail fraud prosecutions for schemes to deprive individuals of a particular intangible right when such a prosecution would contravene the intent of the Congress that created that right.

*Id.* at 926. The court therefore inquired into the congressional policies underlying the NLRA and the LMRDA, the two sources of the rights allegedly defrauded by the defendants.

Two policies underlying the NLRA were found particularly pertinent in *Boffa*: "the remedial nature of the Act and the primacy of the National Labor Relations Board in resolving unfair labor practice disputes." *Id.* at 927. The legislative history evinced Congress's intent that "violations of the civil provisions of the Act were to be without criminal consequences." *Id.* at 928. The Third Circuit, relying upon *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 11, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940), emphasized that the Act's remedial measures " 'relate to the protection of the employees and the redress of their grievances, not to the redress of any supposed public injury ....' " *Id.*

The exclusive authority of the Board to decide what constitutes an unfair labor practice was also considered in *Boffa* to be pertinent in ascertaining the scope of the mail fraud statute. The court stated:

> We believe the 'overriding interest in a uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress', *New York Telephone Co. v. New York Labor Department,* 440 U.S. 519, 528 [99 S.Ct. 1328, 1334, 59 L.Ed.2d 553] (1979), casts serious doubt on the proposition that Congress intended schemes to defraud employees of section 7 rights to fall within the ambit of the mail fraud statute.

688 F.2d at 929. It held on the basis of these two congressional policies that such a scheme does not constitute mail fraud.

The RICO indictment in *Boffa,* as I indicated earlier, also alleged that the defendants Boffa and Lemon had violated the mail fraud statute through a scheme to deprive employees of the loyal, faithful, and honest services of their union president, defendant Sheeran. The Third Circuit's analysis of whether the mail fraud statute could encompass these rights paralleled that of the NLRA rights and is especially instructive of the issue before me.

Section 501(a) of the LMRDA was found to impose fiduciary responsibilities upon union officials and to establish a corresponding right in the members to the honest and

faithful services of union officials. *Id.* at 930–931. The court defined this as an "intangible right" and examined the legislative history for indications as to whether prosecution for schemes to defraud employees of their rights under section 501 would contravene any congressional policy. It found no such indications pointing to the fact that the remedy under section 501 merely permits a union member to bring an action against officials who breach their fiduciary duty but not against employers or third parties. It went on to hold:

This remedy was clearly not intended to be exclusive. *See* 29 U.S.C. § 413 (nothing in this title 'shall limit the rights and remedies of any member of a labor organization under any State or Federal law or before any other court or tribunal'); Cox, *Labor Law Preemption Revisited,* 85 Harv.L.Rev. 1337, 1372 (1972) ('Congress has never developed a comprehensive and impliedly exclusive plan of federal regulation for union-member relations.')... In short, there is no indication that prosecutions for schemes to defraud employers of the intangible right provided in 29 U.S.C. § 501 would contravene any congressional policy. *See United States v. Stout,* 499 F.Supp. 602 (E.D.Pa.1980) (LMRDA does not preclude mail fraud prosecution for union official's scheme to defraud his labor union.)

*Id.* at 931. Therefore, the court concluded that section 501 rights are within the scope of the mail fraud statute. *Id.* at 931.[13]

The issue raised by Local 560's motion to dismiss is whether section 411 rights are within the ambit of the Hobbs Act. With *Boffa* as a guide, I turn now to this issue. The Hobbs Act, 18 U.S.C. § 1951[14] forbids interference with commerce by extortion. The Act defines "extortion" to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear ...." 18 U.S.C. § 1951(b)(2). The essential elements of a Hobbs Act violation, therefore, are—

(1) that the defendants induce their victims to part with property, (2) that they do so through the use of fear, and (3) that, in so doing, they adversely affect interstate commerce.

*United States v. Addonizio,* 451 F.2d 49, 59 (3d Cir.) *cert. denied,* 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972).

■ The Hobbs Act has been construed broadly so as to implement Congress's purpose "to use all the constitutional power Congress has to punish interference with interstate commerce by extortion ...." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1959). For example, with respect to each of the aforementioned elements, it is sufficient if the proofs show (1) that the victim suffered a loss but not necessarily that the extortioner received the fruits of the extortion, *United States v. Provenzano,* 334 F.2d 678, 686 (3d Cir.) *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964); (2) that the extortioner instilled in the victim a fear of economic loss, *Addonizio, supra,* 451 F.2d at 72; *United States v. Sweeney,* 262 F.2d 272 (3d Cir.1959); and (3) that there was some minimal effect on commerce. *United States v. Cerilli,* 603 F.2d 415, 424 (3d Cir.1979) *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980).

Courts have upheld Hobbs Act extortion prosecutions based on the loss not only of tangible property but also of intangible "property" rights. *See United States v. Santoni,* 585 F.2d 667, 673 (4th Cir.1978)

---

**13.** The court also considered and rejected defendants' argument that "by enacting the NLRA, Congress intended to work an implied repeal of existing federal criminal statutes insofar as they regulate 'arguably prohibited' conduct." *Boffa, supra,* 688 F.2d at 932.

**14.** 18 U.S.C.A. § 1951(a) provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

*cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979) (right to make business decision free from outside pressure); *United States v. Nadaline,* 471 F.2d 340, 344 (5th Cir.) *cert. denied,* 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1923) (right to solicit business accounts and hire business representatives); *United States v. Tropiano,* 418 F.2d 1069, 1975–76 (2d Cir.1969) *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970) (right to solicit business accounts); *Bianchi v. United States,* 219 F.2d 182, 189 (8th Cir.) *cert. denied,* 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955) (rights under construction contract); *United States v. Stofsky,* 409 F.Supp. 609, 615 (S.D.N.Y.1973) (right to solicit business). The complaint at issue, as stated earlier, alleges that the property extorted was the members' rights conferred by 29 U.S.C. § 411. In this instance, the LMRDA is the source of such intangible rights. I must therefore determine whether in enacting the LMRDA Congress intended this intangible right to be outside the ambit of the Hobbs Act. *Boffa, supra,* 688 F.2d at 926–927.

■ Section 411, as stated earlier, was enacted by Congress as the central provision of Title I of the LMRDA, creating a "Bill of Rights of Members of Labor Organizations." Title I also gives to union members a direct cause of action against the union and its officers for infringement of these rights. 29 U.S.C. § 412. Any pre-existing state or federal remedies are explicitly preserved by this Title. 29 U.S.C. § 413. *See Maier v. Patterson,* 511 F.Supp. 436 (E.D.Pa.1981). These rights therefore are not within the primary jurisdiction of the National Labor Relations Board. *See Fulton Lodge No. 2 of Internat'l Ass'n of Machinists and Aerospace Workers v. Nix,* 415 F.2d 212 (5th Cir.1969). Under the teaching of *Boffa,* these characteristics are clearly indicative of a nonexclusive statutory

scheme. Furthermore, the LMRDA contains a second and broader saving provision applicable to the entire act:

Except as explicitly provided to the contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or of any trust in which a labor organization is interested, under any other Federal law or under the laws of any State, and, except as explicitly provided to the contrary, *nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State.* (Emphasis added)

29 U.S.C. § 523(a).

The LMRDA is not an " 'impliedly exclusive plan of federal regulation for union-member relations.' " *Boffa, supra,* 688 F.2d at 931 (quoting Cox, *Labor Law Preemption Revisited,* 85 Harv.L.Rev. 1337, 1372 (1972)). The congressional declaration of findings, purposes and policy which prefaces the LMRDA clearly establishes the role this legislation is to play in the larger scheme of labor law:

The Congress further finds, from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct *which require further and supplementary legislation* that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives. (Emphasis added)

29 U.S.C. § 401(b).[15] Therefore, there is no indication that prosecutions for conduct

---

15. Senator Goldwater also reflected on the supplementary nature of the LMRDA and its interaction with the Hobbs Act:

Criminal procedures are surrounded with safeguards for the accused, and are inevita-

bly, slow, cumbersome, uncertain. We do not wish to destroy these safeguards; they are a necessary part of our traditional system of civil liberties and protection against judicial and governmental tyranny. But we can-

which extorts from members the intangible right provided in 29 U.S.C. § 411 would contravene any congressional policy.

■ The defendant also asserts a distinct but related ground for dismissal of paragraph 12(a). It argues that the conduct alleged in the complaint is embraced by a specific criminal provision of the LMRDA, 29 U.S.C. § 530, which precludes application of the Hobbs Act. Plaintiff responds that the two statutes do not cover the same ground. It further argues that even if they did, section 530 cannot be read to repeal the Hobbs Act insofar as extortion of section 411 rights is implicated. I find that section 530 is not an extortion statute and that the principle of statutory construction of implied repealer is inapplicable.

Section 530 provides:

It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this chapter.

The penalty is a fine of $1,000 and/or imprisonment for a term of not more than one year.

The provision as enacted represented a compromise between the House and Senate

versions of the Act. The Senate, as noted earlier, passed the Kennedy-Ervin bill, S.1555, of which section 506(b) made it unlawful for any person to restrain, coerce or intimidate any member "through the use of force or violence, or threat of the use of force or violence, *or by economic reprisal or threat thereof.*" (Emphasis added). A violation of this provision was made a felony with a maximum penalty of $10,000 or imprisonment for not more than 2 years or both. A bill introduced in the House by Rep. Landrum and Rep. Griffin, H.R. 8400, as a substitute for the House bill reported out of committee, H.R. 8342, provided for the same penalty as the Senate bill but did not include the language on economic reprisal emphasized above. The Landrum-Griffin bill was substituted on the floor of the House only after it was amended, *inter alia,* to reduce these criminal penalties to a maximum imprisonment of one year and a fine of $1000.[16] In the conference committee, the House version was adopted on this point.

The reason for the deletion of the phrase "economic reprisal" by the House, and some clue as to its significance, is found in the remarks and analysis of Rep. Griffin:

Section 610 (denial of rights through violence): Like the previous section, this section deals with the denial of rights guaranteed to union members. However, un-

not escape the fact that the requirement of an indictment by a grand jury, the availability of the fifth amendment, the need for proof beyond a reasonable doubt, the right to a jury trial, the rigid rules of evidence, all of which prevail in a criminal prosecution, render this type of sanction an awkward and often ineffectual weapon against misconduct in the labor-management field.

There are now on the Federal statute books three laws in the field of labor which utilize the methods of the criminal prosecution.

\* \* \* \* \* \*

The third instance is the Hobbs Act, which

\* \* \* \* \* \*

is designed to reach many of the practices engaged in by the Teamsters as disclosed by the McClellan hearings, yet, as those hearings conclusively demonstrate, these vicious practices go merrily on despite the Hobbs Act.

Thus, it is evident beyond any reasonable doubt that criminal proceedings are not the proper machinery for cleaning up the abuses in the labor-management field. And incidentally, we should recognize the wisdom of the Congress in deliberately avoiding the criminal law approach in favor of administrative sanctions when it enacted the Wagner and Taft-Hartley Acts to cope with the evils at which those statutes were aimed. However, we do not wish to eliminate these criminal sanctions but rather to supplement them, thus providing a well-rounded and effective enforcement machinery which would give genuine vitality to those few rights which the committee bill confers.
105 Cong.Rec. 9110 (daily ed. June 8, 1959) II Legis.Hist. 1282.

**16.** 105 Cong.Rec. 14513 (daily ed. Aug. 13, 1959) II Legis.Hist. 1685.

like section 609, this section applied to the denial of such rights through force or violence. Criminal penalties in this case are justified and, accordingly, are provided. Section 610 is comparable to section 607(b) of S.1555, which was stricken by the House committee. However, the words "or by economic reprisal or threat thereof" in the Senate-passed bill are omitted in the substitute. We believe the quoted language is too vague for criminal enforcement and, further, that the activity proscribed is covered, and should be prohibited, under the phrase "or otherwise discipline" in section 609 where civil remedies are available for enforcement.

105 Cong.Rec. 13091 (daily ed. July 27, 1959), II Legis.Hist. 1522 (1959). The sanction as passed by the Senate and originally included in the Landrum-Griffin bill was considered too harsh:

> This was a major dispute between the supporters of the Elliott and Landrum-Griffin bills during floor debate. It was the contention of the backers of the Elliott bill that the Landrum-Griffin penalties were so stringent that they might deter honest men from seeking and holding union office. We argued that the rights conferred by the act were so numerous and varied that in most instances the penalty did not fit the crime with the result that this sanction would be both harsh and unworkable. Our argument on this point prevailed and the Landrum-Griffin bill was quietly amended so that the drastic felony penalty was reduced to a misdemeanor. This solution was then adopted by the conference report.

105 Cong.Rec. 16637 (daily ed. Sept. 4, 1959) (remarks of Rep. Udall), II Legis.Hist. 1722. Defendant contends that section 530 was thus enacted as a misdemeanor extortion provision specially tailored to the purposes of the LMRDA. I disagree.

■ As the preceding review of the legislative history indicates and the cases construing section 530 confirm, the conduct proscribed by this provision of the LMRDA is essentially assault and battery. *See United States v. Williams,* 624 F.2d 75 (9th Cir.1980) (defendant hired someone to assault member in retaliation for outspoken opposition); *United States v. Kelley,* 545 F.2d 619 (8th Cir.1976) *cert. denied,* 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977) (defendant threw a bat and fired three shots at truck containing dissatisfied members who were circulating a petition); *United States v. Bertucci,* 333 F.2d 292 (3d Cir.) *cert. denied,* 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964) (brawl found to have arisen out of conspiracy to prevent members from exercising right to attend and participate in meeting); *United States v. Roganovich,* 318 F.2d 167 (7th Cir.1963) (disturbance at a local union meeting over criticism of report of business agent); *Maier, supra,* 511 F.Supp. 436 (E.D.Pa.1981) (genuine issue of material fact as to whether assault was for purpose of chilling section 411 rights). In accord is the view of Senator Morse who, in opposing the passage of section 530, commented—

> [T]he conference committee bill would make it a Federal crime to use force or the threat of force to prevent a member, by intimidation, from exercising rights to which he is entitled under the bill. A similar provision was included in section 607(b) of the Kennedy-Ervin bill, as passed by the Senate. The Kennedy-Ervin bill, however, prohibited economic reprisal, as well as the use of force or the threat of force, and imposed substantially heavier penalties for violations than does the conference committee bill. Generally speaking, the effect of these provisions is to make *assault and battery* a Federal crime, but only when it occurs in a union. I have already referred above to the inappropriateness of provisions of this type for the enforcement of the rights of union members. (Emphasis added)

105 Cong.Rec. 16389 (daily ed. Sept. 3, 1959), II Legis.Hist. 1418.[17] For these rea-

---

17. This is further confirmed by a review of the hearings recently held on the proposed Labor Management Racketeering Act of 1981, S.

1785. Sen. Bill 1785 proposes to toughen certain provisions of the Taft-Hartley Act, the

sons, I do not find, as defendant contends, that section 530 is an extortion statute.

When compared to the prohibition within the LMRDA against extortionate picketing, 29 U.S.C. § 522,[18] it becomes even clearer that Congress carefully chose the words it did and the penalty to be imposed in section 530 in order to penalize labor extortion in the one instance but not in the other. Senator John F. Kennedy commented on the relationship between the Hobbs Act and extortionate picketing provision which became section 522:

> Under the provisions of the Kennedy-Ervin bill last year we provided that anyone who engaged in picketing for the purpose of a shakedown should be guilty of an unfair labor practice. That was an additional remedy, to be available in addition to the Hobbs Act.
>
> There has always been some question as to whether the Hobbs Act applied to cases in which violence did not take place. In addition, this provision provided a quicker remedy. It provided for compul-

sory immediate injunction, while the criminal prosecution might be going on.

> There was some objection to making this practice an unfair labor practice, and a felony rather than a misdemeanor. The Department of Justice raised the question 3 or 4 days ago as to whether this provision might not raise some question as to the sanctions available under the Hobbs Act. Therefore, in order to make sure that there is no choice of sanctions, as between those which might be misdemeanors and those which might be felonies, the amendment is now rewritten, so that the sanctions against using a picket line for the purposes of extorting money are now identical with those under the Hobbs Act.
>
> This provision would not weaken or change the Hobbs Act. It would merely provide that when there is any question as to whether the Hobbs Act applies in cases in which violence does not occur, as in the case of shakedown picketing, adequate sanctions are provided. This lan-

---

LMRDA and ERISA. S.Rep. No. 97–497 introduced the bill thus—

> The purpose of this bill is to afford greater protection for unions and employee benefit plans from corrupt union and management officials by increasing the penalties for violating portions of three statutes—the Labor Management Relations Act of 1947, known as the Taft-Hartley Act; the Employee Retirement Income Security Act of 1974, known as "ERISA", and the Labor-Management Reporting and Disclosure Act of 1959, known as the Landrum-Griffin Act. The bill is a direct outgrowth of public hearings held before the Permanent Subcommittee on Investigations.

One of the provisions of the bill would expand the list of generic crimes which disqualify a person from serving in a fiduciary capacity under the LMRDA, 29 U.S.C. § 504, to parallel the list contained in a similar provision under the Employment Retirement Income Security Act, 29 U.S.C. § 1111. In its examination of the effect of the bill's amendments, the Office of Legislative Affairs of the United States Department of Justice was of the view that:

> The list of specific crimes in Section 111 would also provide new protection under Section 504 with respect to persons convicted of the following statutory crimes:
>
> \*   \*   \*   \*   \*   \*
>
> 3) those deprivations of union members' rights through the threatened use of violence

in violation of 29 U.S.C. 530 which could not otherwise be characterized as *murder, assault with intent to kill, or assault which inflicts grievous bodily injury;* (Emphasis added)

\*   \*   \*   \*   \*   \*

*Hearing Before the Subcomm. on Labor of the Senate Comm. on Labor and Human Resources on S. 1785,* 97th Cong., 2d Sess. 73 (1982). As section 504, in addition to murder, etc., disqualifies persons who have been convicted of extortion, the Justice Department's enumeration supports my construction of section 530 as an assault and battery statute.

18. 29 U.S.C. § 522 entitled "Extortionate picketing; penalty for violation" provides:

> (a) It shall be unlawful to carry on picketing on or about the premises of any employer for the purpose of, or as part of any conspiracy or in furtherance of any plan or purpose for, the personal profit or enrichment of any individual (except a bona fide increase in wages or other employee benefits) by taking or obtaining any money or other thing of value from such employer against his will or with his consent.
>
> (b) Any person who willfully violates this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

guage is in accordance with the views of the Department of Justice.

105 Cong.Rec. 5861 (daily ed. Apr. 23, 1959), II Legis.Hist. 1135. In enacting section 522, therefore, Congress was ensuring one, that extortion would be construed to include nonviolent conduct and two, that that section would operate in tandem with the Hobbs Act. This leads to the other point raised by the parties, whether both the Hobbs Act and section 530 can apply to conduct which infringes upon section 411 rights.

While the defendant refrains from resting upon the disfavored principle of implied repealer, *Posadas v. National City Bank,* 296 U.S. 497, 504–05, 56 S.Ct. 349, 352–353, 80 L.Ed. 351 (1936), to say that section 530 preempts or controls the field is to say the same thing. "'To assume ... that the mere passage of a specific statute covering an area of conduct also regulated by a more general statute limits enforcement of the general statute ... is, in effect, to accomplish a partial repealer of the general statute.'" *Boffa, supra,* 688 F.2d at 932 (quoting *United States v. Burnett,* 505 F.2d 815, 916 (9th Cir.1974) (per curiam), *cert. denied sub nom. Lyon v. United States,* 420 U.S. 966, 95 S.Ct. 1361, 43 L.Ed.2d 445 (1975)). *See also Stout, supra,* 499 F.Supp. at 603. The touchstone for application of implied repealer is the "positive repugnancy" between the provisions. *United States v. Batchelder,* 442 U.S. 114, 122, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979). In *Batchelder,* the Supreme Court stated that "it is 'not enough to show that the two statutes produce differing results when applied to the same factual situation.' *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155 [96 S.Ct. 1989, 1993–1994, 48 L.Ed.2d 540] (1976)." *Id.* The Court reversed the lower court's ruling that two firearm proscriptions were in irreconcilable conflict because their penalty schemes differed.

Here, there has only been evidence that Congress intended the new labor legislation to expand on remedies already available. Moreover, the overlap between the two statutes is not complete. At most, the con-duct alleged in the complaint may be said to give rise to separate and independent violations of law. Although the element of interference with section 411 rights is included within the Hobbs Act allegation, the material elements of the crime of extortion include additional elements, such as effect on interstate commerce and inducing the victim to part with property. Section 530, on the contrary, requires restraint, coercion, or intimidation and a specific intent to interfere with the exercise of LMRDA rights. As the Ninth Circuit has stated, "The existence of overlapping coverage under other criminal statutes does not diminish the scope of the Hobbs Act." *United States v. LaBinia,* 614 F.2d 1207 (9th Cir.) *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980) (coverage under Hobbs Act and Bank Robbery Act, 18 U.S.C. § 2113). Other courts have allowed prosecution under the Hobbs Act even though the alleged criminal conduct might be punishable under a different criminal statute. In *Cerilli, supra,* 603 F.2d at 421, the Third Circuit concluded that 18 U.S.C. § 601 is "Congress' attempt to deal with a problem related to but not identical with the problem at which the Hobbs Act is aimed." The Seventh Circuit compared the Hobbs Act with a violation of the Taft-Hartley Act, 29 U.S.C. § 186(b) in *United States v. Kramer,* 355 F.2d 891, 896 (1966):

> When the charge under the Labor Act is based on a coercive demand or request by a representative of employees, this conduct may also constitute extortion under the Hobbs Act. The fact that the same conduct may give rise to separate and independent violations of law does not render the charges of convictions based thereon inconsistent or mutually exclusive.

This result is consistent with the broad scope of the Hobbs Act, discussed earlier. As the Supreme Court stated: "Our examination of the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language." *United States v. Culbert,* 435 U.S. 371, 380, 98 S.Ct.

1112, 1117, 55 L.Ed.2d 349 (1978). Where two statutes overlap, the right of election belongs to the prosecutor. *Batchelder, supra,* 442 U.S. at 123–25, 99 S.Ct. at 2203–2205. To the extent that the conduct alleged in paragraph 12(a) does state a cause of action under both section 530 and the Hobbs Act, plaintiff has made its choice of the course to follow.

It bears repeating at this time that the defendant's motion under Rule 12(b)(6) attacks paragraph 12(a) on the basis that it cannot set forth a claim upon which relief may be granted. The defendant's brief assumed for purposes of the motion that the acts of intimidation alleged in the complaint induced the members of Local 560 to part with their section 411 rights. Whether the plaintiff will be able to satisfy all the elements of a Hobbs Act offense is not presently before me.

■ In sum, therefore, I have determined that section 411 rights are intangible rights which are within the ambit of the Hobbs Act, and that the Hobbs Act is not impliedly repealed by the LMRDA.

Defendant raises as its final objection the point that paragraph 12(a) essentially makes section 530 of the LMRDA a predicate crime under RICO in violation of the express definition of "racketeering activity." However, this misconstrues the nature of the plaintiff's charges. *Cf. Stout, supra.* I have already determined that section 530 does not prohibit the same conduct prohibited under the Hobbs Act, and it is the Hobbs Act which serves as one of the predicate

offenses in this action. Furthermore, my research has not produced any evidence that the theory of this case contravenes Congress's intent in passing RICO.

■ The Senate Report in its analysis of Title IX which was enacted as RICO stated with respect to the infiltration of labor unions by organized crime:

Closely paralleling its takeover of legitimate businesses, organized crime has moved into legitimate unions.[5] Control of labor supply through control of unions can prevent the unionization of some industries or can guarantee sweetheart contracts in others. It provides the opportunity for theft from union funds, extortion through the threat of economic pressure, and the profit to be gained from the manipulation of welfare and pension funds and insurance contracts. Trucking, construction, and waterfront entrepreneurs have been persuaded for labor peace to countenance gambling, loan sharking and pilferage. As the takeover of organized crime cannot be tolerated in legitimate business, so, too, it cannot be tolerated here.

S.Rep. No. 91–617, 91st Cong., 1st Sess. 78 (1969).[19]

The factual basis for the Senate's statement, as disclosed in footnote 5, is to be found in the reports issued by the Select Committee on Improper Activities in the Labor or Management Field over which Senator McClellan presided. S.Rept. No. 1417, 85th Cong., 2d Sess. (1958); S.Rept.

---

**19.** Senator McClellan expanded on his congressional remarks in an article, 46 Notre Dame L. 55, 141 (1970):

The infiltration of legitimate business by organized crime has been increasingly documented in the past year. Once it invades a legitimate field of endeavor, the mob quickly brings with it a full range of corrupt practices. It sometimes uses terror tactics to obtain a larger share of the market. Labor unions are infiltrated, and then labor peace is sold to businesses. This does not inure to the benefit of the workingman. To the contrary, for example, as documented in a grand jury report I inserted in the *Congressional Record* on December 5, 1969, in New Jersey members of the mob recently required pay-

ments from a contractor so that nonunion men could work at lower wages on a project. In business, the mob bleeds a firm of assets, then takes bankruptcy. It steals securities and then uses the stolen securities to fraudulently obtain funds from lending institutions. It evades taxes and thereby gains an unfair advantage. It monopolizes goods and services thereby raising prices. Through the violence used in its operations and its rigidly enforced code of silence, as well as exploitation of nonmembers in its schemes, the mob seeks to gain immunity from the rules of our society governing business and labor practices. We cannot afford to allow it to succeed in this endeavor.

No. 621, 86th Cong., 1st Sess. (1959); S.Rept. No. 1139, 86th Cong., 2d Sess. (1960). The McClellan hearings were also the impetus behind the passage of the LMRDA, which history I have already set forth. Therefore, both the LMRDA and RICO were implemented to attack the same problem. In my opinion, neither statute mandates a finding that conduct which is regulated or proscribed under the LMRDA cannot also violate RICO. RICO, like the LMRDA, as earlier detailed, is legislation intended to supplement the panoply of remedies designed to reach racketeering. Further, it is to be liberally construed. *See generally United States v. Turkette,* 452 U.S. 576, 588–89, 101 S.Ct. 2524, 2531–2532, 69 L.Ed.2d 246 (1981); *United States v. Frumento,* 563 F.2d 1083, 1090–91 (3d Cir. 1977) *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978).

For all of these reasons, defendant's motion to dismiss paragraph 12(a) is denied. An order in conformance with my determination has been filed by the court.