Robert C. MACAULAY, Sr., Plaintiff,

v.

BOSTON TYPOGRAPHICAL UNION NO. 13 et al., Defendants.

Civ. A. No. 79-6-G.

United States District Court,
D. Massachusetts.

July 25, 1979.

Robert C. Macaulay, Jr., Law Office of Philip I. Tirrell, North Arlington, Mass., for plaintiff.

Paul F. Kelly, Segal, Roitman & Coleman, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER THAT SUMMARY JUDGMENT BE ENTERED FOR DEFENDANTS

GARRITY, District Judge.

Plaintiff, a member of the defendant Boston Typographical Union No. 13, has sued his union, the union president and the union secretary-treasurer for violation of Section 101(a)(5) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(5), claiming that he was "disciplined" within the meaning of Section 101(a)(5) without the statutorily required notice and hearing. Plaintiff moved for partial summary judgment on the issue of whether the union's action was properly classifiable as "discipline" and for reinstatement pending a full and fair hearing. Defendants also moved for summary judgment, arguing first that plaintiff was not "disciplined" and second that plaintiff did not exhaust his internal union remedies. We examined the briefs and heard oral argument. Because we hold that the reclassification of plaintiff from "at the trade" to "not at the trade" was not "discipline" within the meaning of 29 U.S.C. § 411(a)(5), we need not reach defendants' exhaustion argument. Plaintiff's motion for partial summary judgment is, therefore, denied, and there being no genuine issue of material fact in dispute and defendants being entitled to judgment as a matter of law, defendants' motion for summary judgment is hereby granted. Fed.R.Civ.P., Rule 56(c).

Following his loss of a permanent position with the Boston Herald Traveler in 1972, plaintiff worked the equivalent of full time as a substitute printer for the Boston Globe until the fall of 1974 when the scarcity of available substitute work forced him to seek employment elsewhere. He accepted fulltime employment, first as a groundskeeper at a hospital and then as a custodian at a vocational school. From late 1976 until September 1978, plaintiff ceased working at the Boston Globe entirely.

On September 14, 1978, the union's secretary-treasurer, John McManus, wrote a letter to plaintiff requesting an explanation for plaintiff's not having sought work at the Globe for about two years. Following a telephone conversation with plaintiff, McManus informed plaintiff on October 12, 1978 that on account of his failure to seek work he was being reclassified from "at the trade" to "not at the trade". After reclassification the plaintiff retained all his rights and privileges in the union, except that he

lost his priority on the list used to assign substitute work at the Boston Globe. Furthermore, in the "not at the trade" category, he pays flat rate union dues instead of dues based on earnings in the industry.

It is this reclassification that plaintiff argues constitutes "discipline". Article IX of the Constitution of the International Typographical Union provides for a dues structure which in part distinguishes between active members seeking work in the industry, Article IX, sec. 1(a), and active members not seeking work in the industry, Article IX, sec. 1(b). Interpretations of Article IX by the Executive Council of the International Union in effect at the time of plaintiff's reclassification are collected in a publication called "Dues Circular, January, 1978". Section A.1 of the Dues Circular provides that in order to be classified "at the trade" and thus pay dues on earnings in the industry, a member "must show up for work regularly, accept work when available and make proper effort to secure work." Plaintiff's failure to meet these conditions resulted in his being reclassified as "not at the trade."

Section 101(a)(5) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(5), states:

> (5) *Safeguards against improper disciplinary action*—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

The legislative history is of no assistance in determining what is meant by "or otherwise disciplined". *Miller v. Holden*, 5 Cir. 1976, 535 F.2d 912, 914.

The principles enunciated in *Miller v. Holden*, 5 Cir. 1976, 535 F.2d 912, however, are controlling. In that case, the plaintiff, who was terminated from employment with a trust set up by his union, claimed *inter alia* that since the termination constituted "discipline" Section 101(a)(5) required pre-termination notice and hearing. The court held that because his status in the union was unaffected by the termination of his employment with the separate union trust, the plaintiff had not been "disciplined". In the course of its opinion, the court noted two conditions necessary to any action being "discipline" within the meaning of Section 101(a)(5):

> Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

535 F.2d, at 915.

In the instant case, plaintiff is adversely affected by the union action, and reclassification was undertaken under color of the union's authority over him. However, plaintiff has offered no evidence that he has been directly penalized or singled out from other comparable members for special treatment. It appears that the union has fairly applied a reasonable union regulation, controlling the dues and the priority of all members, to the plaintiff. See *Williams v. International Typographical Union, AFL–CIO*, 10 Cir. 1970, 423 F.2d 1295, 1297, *cert. denied*, 1970, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53; *Scovile v. Watson*, 7 Cir. 1964, 338 F.2d 678, 680, *cert. denied*, 1965, 380 U.S. 963, 85 S.Ct. 1107, 14 L.Ed.2d 154. Indeed, several other union members who had not sought work for a prolonged period were reclassified at the same time as plaintiff pursuant to the same union regulation.

Plaintiff insists that the impact of the action alone controls its proper characterization. Motivation and purpose, as well as effect, however, must be examined. *Miller, supra*, at 915. The concept of "discipline" shares much with the notion of a "penalty". Here none of the incidents of a penalty is present. There is no evidence that plaintiff's reclassification resulted from his failing to comply with a duty he owed as a union member to act or refrain

from acting. He was under no obligation to seek work on a regular basis. Moreover, the reclassification was not imposed to deter others from following plaintiff's example or to discourage similar future action by plaintiff himself. Nor was it a form of retribution for plaintiff's having engaged in anti-union conduct. Perhaps most important is the fact that no union stigma whatsoever attached or was intended to attach to plaintiff as a result of his being reclassified.

Plaintiff points to certain events occurring in July and August, 1976 as evidence of defendants' bad faith.[1] A showing of bad faith in enforcing an otherwise reasonable and uniformly applicable nondisciplinary regulation might suggest that the regulation was in fact used as a means of discipline. *Williams, supra,* at 1297. However, nothing in plaintiff's evidence demonstrates bad faith. In July, 1976, plaintiff and some others on the substitute printers list at the Globe received a letter from the Globe's Employee Relations Manager stating that unless plaintiff made himself available for work, he would lose certain benefits he enjoyed under the collective bargaining agreement. After protesting this action to the union officials, plaintiff was told by letter from his union dated July 13, 1976 not to communicate directly with the Globe about the Globe's letter because the Globe was obligated to bargain with the union, not individual members, concerning matters in the collective bargaining agreement. The president of the union on August 6, 1976 sent a letter to the Boston Globe informing the Globe that the plaintiff and others were available for work and suggesting that the Globe contact the union's representative in the composing room if it had employment opportunities for those members.

Plaintiff argues that either the July 13 or the August 6 letter "lulled" him into the false belief that he need not seek work regularly but could rely on his union to bring work opportunities to his attention. In view of his subsequent reclassification, these events, he argues, constitute bad faith. We disagree. The fact that the union did not periodically inform the plaintiff that he should seek employment at the Globe does not indicate bad faith. Plaintiff was under no duty to apply for work, and the union had no interest in encouraging him to do so. Furthermore, nothing in the July 13 letter could have led the plaintiff to believe that he need not show up regularly for work. Finally, counsel admitted at the hearing that plaintiff never saw the August 6 letter before commencing this lawsuit. If he had not seen it, certainly he could not have relied upon it, as he claims.

Plaintiff relies heavily on *Caravan v. Reading Typographical Union No. 86,* E.D. Pa., 1974, 381 F.Supp. 14. The plaintiff in *Caravan,* a member of the defendant union, lost his priority in his union without notice and hearing after it was discovered that he was operating a nonunion printing shop within the union's jurisdiction. In the course of its opinion holding that the union had violated Section 101(a)(5), the court, without any analysis, summarily concluded that the revocation of plaintiff's priority constituted "discipline". 381 F.Supp. at 17, 20.

To the extent that *Caravan* is persuasive on the issue of what constitutes "discipline" —it has not been cited in any published opinion—we feel that it is distinguishable. Although the union regulation at issue in that case was uniformly applicable and not on its face disciplinary in nature, it may have served a disciplinary function as it was applied to the plaintiff. Arguably, a union member has a duty to refrain from operating a nonunion shop, and it is possible that the plaintiff lost his priority as a result of

---

1. Plaintiff also suggests that possible violations of the Union constitution, Article X, Section 2, indicate bad faith. We disagree. First, Article X, Section 2, applies only to "accusations or charges against a member. . . . " The reclassification of plaintiff was not done pursuant to an "accusation or charge". Second, failure to comply with procedures mandated by the Union constitution is not by itself indicative of an improper motivation in reclassifying plaintiff.

his having failed to perform that duty. As pointed out *ante*, there is no evidence that the reclassification of plaintiff in the instant case was in any way connected with his failing to perform a duty he owed as a union member.

For the foregoing reasons, we conclude, that plaintiff Macaulay was not "disciplined" within the meaning of 29 U.S.C. § 411(a)(5). No matter how unfortunate his situation may be, it is not within our power to remedy every injury suffered by a union member; the court's jurisdiction to interfere in internal union affairs is narrowly confined. See, *Howard v. United Ass'n of Journeymen, Etc.*, 1 Cir. 1977, 560 F.2d 17, 21. Hence we grant defendants' motion for summary judgment and order that judgment be entered for the defendants.