**Robert C. MACAULAY, Sr., Plaintiff, Appellant,**

v.

**BOSTON TYPOGRAPHICAL UNION NO. 13, et al., Defendants, Appellees.**

**No. 82–1258.**

United States Court of Appeals, First Circuit.

Argued Sept. 15, 1982.

Decided Nov. 5, 1982.

---

Robert C. Macaulay, Jr., Boston, Mass., for plaintiff, appellant.

Paul F. Kelly, with whom Sharon M. Livesey, and Segal, Roitman & Coleman, Boston, Mass., were on brief, for defendants, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiff appeals from a judgment of the district court holding that the defendants' reclassification of plaintiff from "at the trade" to "not at the trade" was not "discipline" within the meaning of section 101(a)(5) of the Landrum-Griffin Act, 29 U.S.C. § 411(a)(5). We affirm, 474 F.Supp. 344.

Plaintiff Robert C. Macaulay, Sr. entered the printing trade in 1952 and became a member in good standing of the defendant Boston Typographical Union No. 13. Following his loss of a permanent position with the Boston Herald Traveler in 1972, plaintiff deposited his union card at the Boston Globe and was assigned a number on the union's "priority list." His position on the priority list was determined by the date he first made himself available for work at the Globe.

The priority list has a wide-ranging effect on the employment opportunities available to a printer in plaintiff's position. First, it determines which members are entitled to a situation (union parlance for a full-time job) when one becomes available, and second, it determines which members will be hired on any given day when substitute printers are needed. Under this system, plaintiff had priority for any employment opportunities over union members who made themselves available for work at the Globe at a later date than did plaintiff.

To obtain a place on the priority list, a member must be classified as "at the trade." The union's Dues Circular, a document containing Executive Council interpretations of Article IX of the International Typographical Union Constitution, explains that to be classified as "at the trade" a member "must show up for work regularly, accept work when available and make proper effort to secure work." A union member who is reclassified from "at the trade" to

"not at the trade" loses his place on the union priority list.[1]

From 1972 until the fall of 1974 plaintiff worked the equivalent of full time as a substitute printer for the Boston Globe. In 1974 the scarcity of work forced him to seek work outside the printing industry. From late 1976 until September 1978 he ceased reporting for work at the Boston Globe entirely. Throughout this time, 1972–1978, plaintiff was classified as "at the trade."[2]

On September 14, 1978, the union's secretary-treasurer, defendant McManus, wrote a letter to plaintiff requesting an explanation for plaintiff's not having sought work at the Globe for about two years. Following a subsequent telephone conversation with plaintiff, McManus informed him on October 12, 1978, that because he failed to report for work, plaintiff was being reclassified to "not at the trade." As a result, plaintiff lost his place on the priority list.[3] He retained all his other rights and privileges as a union member.

Plaintiff then requested an appeal before the union's Executive Council, the first step in the union's internal remedial procedures. A hearing was scheduled but plaintiff failed to appear.

1. A member's classification as "at the trade" or "not at the trade" also determines the dues the member pays. If a member is "at the trade," he pays dues at a rate based on a set percentage of his earnings as a printer; a member who is "not at the trade" pays dues at a flat rate.

2. In July 1976 plaintiff received a letter from the Employee Relations Manager of the Boston Globe stating that unless plaintiff reported regularly to the Globe for work, he would lose his coverage under the United Newspaper General Benefits and Welfare Fund. When plaintiff informed the union's Executive Council that he had received this letter, they directed him and all other members who received similar letters not to respond. Plaintiff argues that these events gave him just cause to believe that the union had ceased enforcing its rule requiring "at the trade" members to report for work regularly.

3. Counsel for the union explained at oral argument that the reclassification was the result of a new agreement reached between the union and the Globe designed to alleviate some of the harsh effects of computerization in the newspaper industry. According to this agreement, the Globe would reduce the number of situation

Macaulay sued the union in federal district court alleging that he was "disciplined" without proper procedural safeguards in violation of section 101(a)(5) of the Landrum-Griffin Act, 29 U.S.C. § 411(a)(5), which states:

(5) *Safeguards against improper disciplinary action.*—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

The union defense was twofold: that its reclassification was not discipline and that plaintiff was barred from seeking relief because of his failure to exhaust internal union remedies. The district court found that no discipline was involved and did not reach the exhaustion issue.

The basic inquiry is what union action constitutes "discipline" under section 101(a)(5). The Landrum-Griffin Act contains no definition of the term, and the

holders to 300. This was to be accomplished by creating early retirement incentives for those printers working full-time. As they retired, substitute printers would replace them at a ratio of three to one; that is, for every three situation holders that retired, one substitute would get a situation. This three to one ratio was to continue until the Globe employed a total of 300 printers at which time the hiring of substitutes for full-time work would occur on a one for one basis. The union and the Globe agreed, however, that no more than eighty substitutes would receive situations pursuant to this agreement and that only substitutes who had priority recorded as of September 11, 1978, would be eligible for situations. The union and the Globe believed that fairness dictated that only those substitutes who had been showing up for work regularly should be included in the list of eighty substitutes eligible for full-time and part-time employment pursuant to the agreement. Thus, the union, pursuant to its rule, began reclassifying members who had not shown up for work regularly to "not at the trade," thereby removing these members from the priority list.

legislative history is, for the most part, unenlightening. We turn to the words of the statute. Under the principle of *ejusdem generis,* the general expression "otherwise disciplined" should be construed by determining what acts are similar to the other specific acts included in the section, i.e., fining, suspending, and expelling. *See Miller v. Holden,* 535 F.2d 912, 914–15 (5th Cir.1976); *Maier v. Patterson,* 511 F.Supp. 436, 444 (E.D.Pa.1981). What these terms have in common is that they all "refer[ ] to punishment or adverse consequences that a union, operating through its own tribunal, can impose either by virtue of its own authority over its members or by virtue of its relationship with or influence over the actions of the employer or potential employers of its members." *Phillips v. International Association of Bridge, Structural and Ornamental Iron Workers, Local 118,* 556 F.2d 939, 941 (9th Cir.1977) (footnote omitted). The defined acts are disciplinary because the union member is directly penalized or singled out from other comparable members for special treatment.

The meaning of the words "otherwise disciplined" also derives from the purpose of the Act. In enacting title I of the Landrum-Griffin Act, which includes section 101(a)(5), Congress' "concerns were with promoting union democracy, and *protecting the rights of union members from arbitrary action* by the union or its officers." *Finnegan v. Leu,* —— U.S. ——, ——, 102 S.Ct. 1867, 1872, 72 L.Ed.2d 239 (1982) (emphasis added). The even-handed application of a reasonable union rule is not arbitrary action by a union or its officers. It would be arbitrary, however, to use a union rule in bad faith in order to punish a member; this would constitute "discipline" within the meaning of the Act. As the district court pointed out, there was no evidence of such bad faith here.

The rule that discipline under the Act must entail singling out a union member (or a group of members) for punishment and its corollary, that the uniform application of a

reasonable union regulation is not discipline finds support in most of the circuits that have considered the question. There are two cases directly on point. In *Galke v. Duffy,* 645 F.2d 118 (2d Cir.1981), the court held that the union's reclassification pursuant to a union rule of a union member's seniority status was not discipline. *Williams v. International Typographical Union,* 423 F.2d 1295 (10th Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970), concerned the identical situation as the instant case, the reclassification of a printer from "working at the trade" to "not working at the trade." In finding that discipline was not involved, the court stated:

> The classification regulation was fairly applied to plaintiff. No showing is made of any improper motivation, of any discrimination, or of any intent to punish the plaintiff by depriving him of privileges. The Unions simply enforced their rule pertaining to members having full-time employment outside the printing trade.

*Id.* at 1297. The Fifth Circuit has defined discipline as follows:

> Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

*Miller v. Holden,* 535 F.2d 912, 915 (5th Cir.1976) (footnote omitted). In a case involving a prospective rule denying a member with excessive absenteeism arbitration rights, the Seventh Circuit found no violation of section 101(a)(5) and noted: "It can hardly be said that 'discipline' within the meaning of the statute includes action that may be taken, or rather withheld, by the union as a matter of policy." *Scovile v. Watson,* 338 F.2d 678, 680 (7th Cir.1964), *cert. denied,* 380 U.S. 963, 85 S.Ct. 1107, 14 L.Ed.2d 154 (1965).[4]

---

4. Two circuit courts have discussed whether discipline was involved in action taken by the

international association against a local union. In *Local 37 v. Sheet Metal Workers' Interna-*

Appellant's reliance on Judge Oakes' dissent in *Galke v. Duffy* is misplaced. Judge Oakes felt that there were facts showing that the union member had been singled out for special treatment:

> The determination whether application to an employee of a union regulation—such as the reduction of appellant's seniority here—constitutes discipline seems to turn on whether the employee has been "singled out" and whether he disputes the facts underlying the application of the regulation to him.

*Galke v. Duffy*, 645 F.2d at 121 (Oakes, J., dissenting). There was no such showing here:

> In the instant case, plaintiff is adversely affected by the union action, and reclassification was undertaken under color of the union's authority over him. However, plaintiff has offered no evidence that he has been directly penalized or singled out from other comparable members for special treatment. It appears that the union has fairly applied a reasonable union regulation, controlling the dues and the priority of all members, to the plaintiff. Indeed, several other union members who had not sought work for a prolonged period were reclassified at the same time as plaintiff pursuant to the same union regulation.

*Macaulay v. Boston Typographical Union No. 13,* 474 F.Supp. 344, 346 (D.Mass.1979) (citations omitted).

As with the district court, we do not reach the exhaustion issue. We think it appropriate, however, to repeat the words of Mr. Justice Harlan concurring in *NLRB v. Marine Workers,* 391 U.S. 418, 429, 88 S.Ct. 1717, 1724, 20 L.Ed.2d 706 (1968):

> Finally, it is appropriate to emphasize that courts and agencies will frustrate an important purpose of the 1959 legislation if they do not, in fact, regularly compel union members "to exhaust reasonable

hearing procedures" within the union organization. Responsible union self-government demands, among other prerequisites, a fair opportunity to function. (footnote omitted).

*Affirmed.*

*tional Association,* 655 F.2d 892, 896–98 (8th Cir.1981), the court held that section 101(a)(5) was not implicated when the international ordered Local 37 merged with Local 3 without notice or an opportunity to be heard. The Fourth Circuit, in *Parks v. International Broth-* *erhood of Electrical Workers,* 314 F.2d 886, 920–22 (4th Cir.), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963), held that a charter revocation order by the international against a local union stated a cause of action under section 101(a)(5).