**DEPARTMENT OF LABOR, Elizabeth Dole, Secretary, Plaintiff–Appellant,**

v.

**ALUMINUM, BRICK AND GLASS WORKERS INTERNATIONAL UNION, LOCAL 200, Defendant–Appellee.**

No. 90–7505.

United States Court of Appeals, Eleventh Circuit.

Sept. 12, 1991.

Frank W. Donaldson, U.S. Atty., Katherine L. Corley, Asst. U.S. Atty., Birmingham, Ala., Jeffrica J. Lee, Michael Jay Singer, U.S. Dept. of Justice, Civil Div., Appellate Staff, Washington, D.C., for plaintiff-appellant.

Frank B. Potts, Robert L. Potts, Sherry Collum–Butler, Potts & Young, Florence, Ala., for defendant-appellee.

Before KRAVITCH, Circuit Judge, and GODBOLD and CLARK, Senior Circuit Judges.

KRAVITCH, Circuit Judge:

The Secretary of Labor brought this suit against a union, Local 200, Aluminum, Brick & Glass Workers International, alleging it had denied some of its members the right to participate in the election of union officers. At issue was whether the union could condition the members' participation in union elections upon the payment of an assessment to assist other workers on strike. The union moved for summary judgment under Fed.R.Civ.P. 56(b), which the district court granted. We affirm.

## BACKGROUND

Local 200 represents approximately 1,200 hourly-wage workers in the aluminum industry in Alabama. About fifty of its members work at the Muscle Shoals Minerals Company in Tuscumbia; the others work at Reynolds Metals Company in Listerhill. In May 1986 the International Union's national bargaining committee voted for a strike against Alcoa, another aluminum company, but not against Reynolds. The national committee also voted to assess each union member working for Reynolds $25 to aid the striking Alcoa workers. Local 200 members met on June 9–10 and approved the $25 strike assessment to be paid by Reynolds workers each week beginning June 9 for as long as the Alcoa strike lasted.[1] Some members authorized Reynolds to withhold the $25 per week and transmit it to Local 200, but this check-off system was not implemented until the Alcoa strike had been underway for two weeks and the company deducted only after that two-week period. The strike lasted five weeks, so each Reynolds member of Local 200 owed a total of $125. For those members who authorized a check-off system, $50 was due directly and $75 was withheld by Reynolds. Local 200 notified its members of the assessment by letter on June 25, 1986.

In the months following the assessment, some members paid in full, some paid in part, and some did not pay. The issue arose again when Local 200 was preparing for its triennial election of union officers, which was scheduled for October 1988.[2] On July 29, 1988, Local 200 sent a letter to all members—including those not working on account of reductions in the work force, vacation or illness—notifying them of the upcoming meeting for nominations for the union offices. The letter quoted from the Local 200 Constitution, Art. XIII, Section 2, which states:

> Only members in good standing shall be allowed to vote. Good standing in the Local Union shall be defined as:
>
> All dues (except current months dues), fines, reinstatement fees, and *assessments*, must be paid in full not later than the adjournment of the nomination meeting.

Art. XIII, Sec. 2 (Oct. 1987 version) (emphasis added). On August 16, 1988 the local

---

1. The vote for the assessment was 318 to 16 with one abstention. The Muscle Shoals employees were not required to pay the assessment because they were part of a separate bargaining unit.

2. The offices were President, First Vice President, Second Vice President, Secretary–Treasurer, Recording Secretary, Sergeant-at-Arms, Business Representative, and three Trustees.

posted on its bulletin boards a reminder that all "strike assessments must be paid prior to adjournment of the nominations meeting in order to vote in the next general election of officers." Local 200 then sought a ruling from the International Union on whether members who had not paid the Alcoa strike assessment on time would be allowed to vote, nominate and run for office in the upcoming election. Ernie La-Baff, president of the International Union, informed Local 200 that under Article XXVI of the International's constitution, any member who became two months in arrears in the payment of "dues, financial obligations, or assessments" automatically lost good standing status and was subject to the eligibility requirements of the local's constitution. The Local 200 Constitution stated that voters must have been in good standing as of the end of nominations;[3] that those who nominate must have been in good standing for six months prior to nominations;[4] and that those who are nominated must have been in continuous good standing and have paid all assessments during the thirty-six months prior to nominations.[5]

When the nominations meeting concluded August 23, 1988, about 400 members had not paid the strike assessment in full and were thus ineligible to vote. In addition, four nominations were voided either because the nominating member had not been in good standing at the time of the meeting or the nominee had not been in good standing for the previous thirty-six months.[6] In the resulting slate, three candidates ran for President; for each of the other offices one candidate ran unopposed. The election was held October 10, and the incumbent president won a majority with 148 votes, com-

pared to 89 and 44 for each of the challengers. Forty-four voters who had not paid as of the nomination meeting voted, but their votes were not counted. After two union members, Hinton and Dawson, complained that they unfairly had been denied the right to be nominated and had exhausted internal remedies, the Secretary of Labor filed this suit pursuant to Title IV of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 401 *et seq.* The Secretary alleged that Local 200 members who had not paid the strike assessment on time had been entitled to participate in the October election under 29 U.S.C. § 481(e) and sought a new election under the supervision of the Department of Labor. 29 U.S.C. § 482. The Secretary also alleged that those members had been subject to improper disciplinary action and therefore had been denied due process under 29 U.S.C. § 411(a)(5). The district court decided that relief was not available under either section 481(e) or 411(a)(5) because those sections protected only union members in good standing and the union had determined that good standing depended on payment of the strike assessment. The Secretary appeals.

## LABOR CODE CLAIMS

The Secretary relies on two separate statutory sections to prove a violation of the federal labor code. One is in the subchapter dealing with union elections:

> In any election required by this section ... every *member in good standing* shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to *reasonable qualifications uniformly imposed*) and shall have the

---

3. Art. XIII, Sec. 2.

4. Art. XII, Sec. 8.

5. Art. XII, Sec. 4 and 4(2).

6. An August 26 letter to Local 200 members stated that the following nominees had been declared ineligible: Ernest Kilpatrick, for all offices and Morris Gray, Travis Dawson, and Kenneth Hinton for Business Representative. Kilpatrick and Dawson were declared ineligible due to their lack of continuous good standing for the previous 36 months; Gray and Hinton were declared ineligible based on their nominators' lack of good standing. Gray ultimately was nominated and ran for president and did not contest the election. Hinton had paid the assessment in time, but he was nominated by Dawson, who had paid only in July 1988 and thus lacked good standing for the previous six months. Although not allowed to run or nominate, Dawson and Hinton were allowed to vote. Kilpatrick had not paid in full as of the nomination meeting so was disqualified from both voting and eligibility for office.

right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof.

29 U.S.C. § 481(e) (emphasis added).[7] The second provision deals with safeguards against improper disciplinary action and is in the subchapter enumerating the Bill of Rights of individual union members:

No *member* of any labor organization may be fined, suspended, expelled, or *otherwise disciplined except for nonpayment of dues* by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5). The coverage of both of these statutory provisions is affected by the following definition in the Act:

"Member" or "member in good standing", when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization.

29 U.S.C. § 402(o). These three sections of the labor code form the framework of the lawsuit. We have plenary review of the district court's disposition of summary judgment. *See Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir.1986); *Thrasher v. State Farm Fire & Casualty Co.*, 734 F.2d 637, 638 (11th Cir.1984).

The Secretary argues that the members whose votes and nominations were voided by the failure to pay the strike assessment were still members in good standing under section 402(o), union rules notwithstanding. She contends that those members therefore were entitled to full voting and nomination

rights under section 481(e) and that the condition of full payment of the strike assessment was not a "reasonable qualification uniformly imposed." The Local argues that the union interpretation of good standing should govern, thus placing members who had not paid the strike assessment beyond the reach of section 481(e). Even if those members were in good standing, Local 200 claims that the payment requirement was a "reasonable qualification uniformly imposed." The Secretary also argues that those members were entitled to the protections of section 411(a)(5) because their exclusion from the election constituted discipline and because the strike assessment was not the equivalent of dues, which are exempt from the due process protections of section 411(a)(5). Local 200 disputes both the "discipline" and "dues" readings of section 411(a)(5). Furthermore, Local 200 relies upon the union's definition of good standing to argue that section 411(a)(5) does not even apply to the members in question, the same threshold argument it makes under section 481(e).

The preliminary inquiry is whether the union's definition of member or member in good standing should govern in this case. If it does, the summary judgment in favor of the union on both the section 481(e) and 411(a)(5) claims should be affirmed because neither statutory section would apply. There is no dispute that the members excluded from the election had met the requirements for membership before the strike assessment was imposed. There is also no dispute that under the rules of the International and the Local unions, those who had not timely paid the Alcoa strike assessment forfeited their right to vote, nominate and be nominated in the October election because they had lost their membership in good standing status. The question is whether this result is so unfair that the federal statute dictates another result.

█ Section 402(o) states that the definition of membership, or at least the process of suspending membership, should be "consistent with lawful provisions of the consti-

---

**7.** Section 504, which prohibits certain persons who have been convicted of various felonies or are members of the Communist Party from holding union office, is not at issue in this case.

tution and bylaws" of the union. Cases have held, however, that a "member" under the statute is not strictly limited to what the union recognizes as a member. *See, e.g., Building Material and Dump Truck Drivers, Local 420 v. Traweek,* 867 F.2d 500, 509 (9th Cir.1989); *Brennan v. Local 357, Int'l Bhd. of Teamsters,* 709 F.2d 611, 614–15 (9th Cir.1983); *Erkins v. Bryan,* 663 F.2d 1048, 1052 (11th Cir.1981), *cert. denied,* 459 U.S. 989, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982); *Alvey v. General Elec. Co.,* 622 F.2d 1279, 1284 (7th Cir.1980); *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10,* 605 F.2d 1228, 1239 (2d Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980); *Hughes v. Local No. 11, Int'l Ass'n of Bridge, Structural and Ornamental Ironworkers,* 287 F.2d 810, 815 (3d Cir.), *cert. denied,* 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961); *Donovan v. United Counties Carpenters Dist. Council,* 561 F.Supp. 791, 795 (N.D.Ohio 1983), *aff'd,* 735 F.2d 1363 (6th Cir.1984). Although a union's interpretation of its own bylaws and constitution is entitled to deference, the court may apply its own definition of membership to vindicate the purpose of the Act, which was to guard the rights of union members against abuse by union officials. *See In re Gopman,* 531 F.2d 262, 266 (5th Cir.1976);[8] *Smith v. Local No. 25, Sheet Metal Workers Int'l Ass'n,* 500 F.2d 741, 750 (5th Cir.1974). The union's interpretation of its own documents will be respected only to the extent it is fair and reasonable. *See Taylor v. Great Lakes Seamen's Union, Local 5000,* 701 F.2d 590, 592 (6th Cir.1983) (per curiam); *Local 317, National Post Office Mail Handlers v. National Post Office Mail Handlers,* 696 F.2d 1300, 1302 (11th Cir.1983). In the context of defining "member," this may involve determining whether membership has been denied to a member "in substance" or has been denied because the union failed to exercise a mere ministerial duty to bestow membership upon someone who properly had met all the existing requirements for membership. *Alvey,* 622 F.2d at 1284; *Local 357,* 709 F.2d at 615.

■ Although the conditioning of good standing status upon payment of a strike assessment appears fair and reasonable, we need not rest our decision on the definition of "member" or "member in good standing" in section 402(*o*). Appellant's claims fail on other grounds. We hold that the requirement of paying a strike assessment was a "reasonable qualification uniformly imposed" under section 481(e), and thus also was a reasonable rule under section 411(a)(1), and that union officials in this case did not "discipline" members in the meaning of section 411(a)(5) by excluding them from the election. Therefore, there is no legal ground for relief and the summary judgment must be affirmed.

As noted above, section 481(e) governs the rules for eligibility for union office, which may be subject to "reasonable qualifications uniformly imposed." A leading case on this issue is *Local 3489, United Steelworkers of America v. Usery,* 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977). In that case, the Secretary of Labor argued that a union constitution that limited eligibility for local union office to members who had attended at least half the union meetings during the preceding three years was unreasonable and a violation of the Act. This rule rendered 96.5% of the local union members ineligible for office. The Court stated that the Act "does not render unions powerless to restrict candidacies for union office" due to the "reasonable qualifications" language in section 481(e), but cautioned that the language should not be given broad reach. *Id.* 97 S.Ct. at 614. The Court reasoned that the anti-democratic effect of disqualifying 96.5% of the membership based on the meeting attendance rule was not a "reasonable qualification" of election privileges because it substantially limited the pool of possible opposition candidates. *Id.* 97 S.Ct. at 615–16. The Court concluded by quoting from Department of Labor reg-

---

**8.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

ulations that stated "reasonable qualifications" such as meeting requirements should be gauged " 'in light of all the circumstances of the particular case,' " including the ease of meeting the qualification and the number of members excluded by the operation of the rule in question. *Id.* 97 S.Ct. at 616 (quoting 29 C.F.R. § 452.-38(a)(1976)). Using this approach, federal courts have upheld some union qualifications on electoral eligibility as "reasonable," but struck others. *Compare, e.g., Brock v. International Org. of Masters, Mates & Pilots,* 842 F.2d 70 (4th Cir.1988) (24–month continuous good standing requirement reasonable); *Colpo v. General Teamsters Local 326,* 504 F.Supp. 573 (D.Del.1980) (same), *aff'd on other grounds,* 659 F.2d 399 (3d Cir.1981); *Donovan v. Local 500, Transport Workers Union of America,* 111 L.R.R.M. 2499 (BNA), 1982 WL 1602 (S.D.Fla.1982) (12–month continuing good standing requirement reasonable); *with Doyle v. Brock,* 821 F.2d 778 (D.C.Cir.1987) (meeting attendance requirement that effectively excluded 97% of membership from eligibility for office unreasonable); *Marshall v. Local 1402, Int'l Longshoremen's Ass'n,* 617 F.2d 96 (5th Cir.) (meeting requirement excluding 93.7% of membership unreasonable), *cert. denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980); *Dole v. American Federation of State, County, and Mun. Employees,* 715 F.Supp. 1119 (D.D.C.1989) (excluding members over age 65 unreasonable); *Donovan v. Pennsylvania Optical Workers Ass'n,* 603 F.Supp. 193 (E.D.Pa.1985) (meeting requirement excluding 80% of membership unreasonable). The Department of Labor regulations interpreting the statute acknowledge that "whether a qualification is reasonable is a matter which is not susceptible of precise definition, and will ordinarily turn on the facts in each case." 29

C.F.R. § 452.36(a)(1990). The regulations suggest several factors to consider in assessing the reasonableness of a qualification, such as its relationship to the needs of the union and the office in question, its impact on the election, and the degree of difficulty members have in satisfying it.[9]

█ A nearly identical analysis applies to the right of union members to vote in union elections. The right to vote is explicit in section 481(e), but it is uncertain from the statute whether it is modified by the parenthetical phrase that precedes it subjecting eligibility to run for and hold office to "reasonable qualifications uniformly imposed." Regardless of the resolution of this issue, it is clear from section 411(a)(1) ("Bill of Rights" of union members) that the right of union members to vote in union elections is "subject to reasonable rules and regulations in such organization's constitution and bylaws." 29 U.S.C. § 411(a)(1); *see Millwright Local No. 1079 v. Brotherhood of Carpenters & Joiners,* 878 F.2d 960, 963–64 (6th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 407, 107 L.Ed.2d 373 (1989); *McGinnis v. Local Union 710, Int'l Brotherhood of Teamsters,* 774 F.2d 196, 200 (7th Cir.1985), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986); *Carothers v. McCarthy,* 705 F.Supp. 687, 694 (D.D.C.1989); *Panter v. American Synthetic Rubber Corp.,* 686 F.Supp. 1210, 1223 (W.D.Ky. 1984), *aff'd* 845 F.2d 327 (6th Cir.), *cert. denied,* 488 U.S. 827, 109 S.Ct. 77, 102 L.Ed.2d 54 (1988); *see also* 29 C.F.R. § 452.85 ("Reasonable qualifications on the right to vote. The basic right of members to vote in elections of the labor organization may be qualified by reasonable rules and regulations in its constitution and bylaws."). Therefore, both the right to vote and the right to run for and hold union

---

**9.** The regulations list the following factors:
(1) The relationship of the qualification to the legitimate needs and interests of the union;
(2) The relationship of the qualification to the demands of union office;
(3) The impact of the qualification, in the light of the Congressional purpose of fostering the broadest possible participation in union affairs;

(4) A comparison of the particular qualification with the requirements for holding office generally prescribed by other labor organizations; and
(5) The degree of difficulty in meeting a qualification by union members.
29 C.F.R. § 452.36(b).

office may be subject to reasonable conditions, even if they derive from separate sections of the labor code. *See McGinnis,* 774 F.2d at 200; *Alvey,* 622 F.2d at 1285.

In this case we conclude that the required Alcoa strike assessment combined with other longstanding union rules constituted a reasonable qualification or regulation of members' eligibility to vote and run for union office. All members were notified of the assessment after it was overwhelmingly approved.[10] Before nominations took place members were twice notified through mailings and postings on union bulletin boards that failure to pay the assessment would forfeit their right to vote in the upcoming elections, and they were given until the end of the nomination meetings to pay. Although the Alcoa strike had abated by that time, Local 200 still had a valid interest in collecting the strike assessment levied equally on all Reynolds members.[11] The conditioning of good standing upon full payment of dues and assessments is a common constitutional provision. *See* International Union Const., Art. XXVI.

One important factor in determining whether the strike assessment condition was unreasonable was its impact on the election. Four hundred members, about one third of the membership, were disqualified from voting. Of those who did vote, about one sixth were disqualified based on the failure to pay the strike assessment in time. Had that sixth voted against the ultimately victorious candidate for President, the only contested office on the ballot, it could have forced a run-off because none of the candidates would have garnered a majority. The ultimate outcome, of course, cannot be determined. However, the exclusion of voters was not of the magnitude usually associated with the substantial anti-democratic effect of unreasonable qualifications. *See, e.g., Steelworkers,* 429 U.S. at 307, 97 S.Ct. at 613 (96.5%

excluded); *Wirtz v. Hotel, Motel and Club Employees Union, Local 6,* 391 U.S. 492, 502, 88 S.Ct. 1743, 1749, 20 L.Ed.2d 763 (1968) (93%); *Doyle,* 821 F.2d at 783 (97%); *Marshall,* 617 F.2d at 97 (93.7%). Most important, the actual impact here, although not negligible, is less serious than in other cases of unreasonable qualification because the members were given a chance to cure the defect shortly before the election took place. Unlike other cases where the time for cure had long passed by the time the consequences of the qualification were apparent (e.g., 18 months prior to elections, as in *Steelworkers*) or where cure was impossible (e.g., age limits), here the members were twice notified before nominations of the consequences of not paying and had several weeks in which to pay and regain full voting rights.

The question of the four candidates disqualified from office is more troubling. As noted above, two members were nominated and accepted the nominations, but were disqualified because their failure to pay the strike assessment had resulted in a loss of good standing. *See supra* n. 6. The union constitution required thirty-six months of continuous good standing prior to nomination. Local 200 Const. Art. XII, sec. 4(2). Two other members were disqualified based on the defective standing of their nominators. If they had been allowed to run, there would have been one more candidate for all offices and three more candidates for the position of Business Representative, which ultimately went to a candidate who ran unopposed. Their exclusion is more troubling than that of the voters because once the issue of exclusion based on the strike assessment became certain in the months before nominations, it was too late to cure the defect because certain members had not been in good standing in preceding months.[12] However,

---

10. Appellant does not challenge the legitimacy of the initial imposition of the strike assessment, only its application to membership and voting rights in the union election in the fall of 1988.

11. The Local forwarded the strike assessment money to the International Union.

12. Dawson's explanation for not paying earlier was that he forgot. Hinton had a chance to cure the defect at the nomination meeting by getting someone in good standing to nominate him, but he declined at the time.

we can only assume the members were familiar with the good standing requirements of their own constitution, a copy of which they receive upon becoming members, and that failure to pay an assessment might put their candidacy or those of their nominees in jeopardy. Although they did not receive specific notice of the consequences of default, which the voters did, we cannot say that their exclusion based on the failure to pay a strike assessment within a certain time period had such an anti-democratic effect on the election that a new one is warranted. The conditioning of eligibility for office upon prompt and full payment of an assessment uniformly imposed on all Reynolds workers does not appear unreasonable. Accordingly, the union prevails on the section 481(e) claim.

Nor does anything in section 411(a)(5) dictate a different result. We agree with the district court that the forfeiting of voting and nomination rights based on a good standing rule imposed throughout the local is not the sort of disciplinary action envisaged by that section of the Act. Specifically, section 411(a)(5) is a union member's due process safeguard against improper disciplinary action, such as suspension, expulsion or fines. The question is whether those members disqualified from voting or running for office were "otherwise disciplined" without proper notice and a hearing. We addressed this statutory section in *Turner v. Local Lodge No. 455, Int'l Bhd. of Boilermakers,* 755 F.2d 866 (11th Cir.1985). In *Turner,* we held that a ninety-day "benching," or ban on referral for employment from an out-of-work list, of seven union members for failure to report to work did not constitute "discipline" within the meaning of section 411(a)(5). Although recognizing some ambiguity in the statute, the court stated that "otherwise disciplined" should refer to actions similar in kind to those described just before it: fine, expulsion, and suspension. *Id.* at

869–70 (quoting *Miller v. Holden,* 535 F.2d 912, 914–15 (5th Cir.1976)). It stated: "The word 'discipline' refers only to a retaliatory act that would affect a union member's rights or status as a *member* of the union." *Id.* at 869 (emphasis original). *See also Breininger v. Sheet Metal Workers Int'l Ass'n, Local Union No. 6,* 493 U.S. 67, ——, 110 S.Ct. 424, 440, 107 L.Ed.2d 388 (1989) (failure to refer union member not discipline); *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982) (dismissal from union office not discipline); *Macaulay v. Boston Typographical Union No. 13,* 692 F.2d 201 (1st Cir.1982) (reclassification of union member to "not at the trade" due to failure to seek work not discipline); *Local 37, Sheet Metal Workers' Int'l Ass'n v. Sheet Metal Workers' Int'l Ass'n,* 655 F.2d 892, 898 (8th Cir.1981) (merger of two local unions not discipline). As was well stated in *Macaulay:*

> Under the principle of ejusdem generis, the general expression "otherwise disciplined" should be construed by determining what acts are similar to the other specific acts included in the section, i.e., fining, suspending, and expelling.... The defined acts are disciplinary because the union member is directly penalized or singled out from other comparable members for special treatment.... The even-handed application of a reasonable union rule is not arbitrary action by a union or its officers. It would be arbitrary, however, to use a union rule in bad faith in order to punish a member; this would constitute "discipline" within the meaning of the Act.

*Macaulay,* 692 F.2d at 204.

In this case, the disqualification of certain union members was not "discipline" within the meaning of the Act.[13] There is no evidence that the union leadership manipulated the good standing requirements to deprive certain members of voting rights. The rules barring participation based on the failure to pay the strike as-

---

**13.** Because we rest our section 411(a)(5) determination on this point, we need not decide if the strike assessment is the equivalent of "dues,"

which are exempted from the due process provisions of section 411(a)(5).

sessment were applied automatically to all applicable members and appellant points to no particular group or faction that was excluded from the process by their operation. The implementation of the rules was not a retaliatory action against a member or members for particular acts. This is not to say the union officials' conduct was exemplary: it could have provided more specific notice of the effect of the failure to pay the strike assessment on nominations, as it did with voting. Nevertheless, their enforcement of the union good standing rules for an apparently legitimate purpose is not the sort of improper discipline that section 411(a)(5) was designed to prevent. Furthermore, as appellee notes, the inappropriateness of applying this statutory subsection becomes clearer when the impracticality of holding 400 due process hearings to determine eligibility based on nonpayment of the strike assessment is considered. *Cf. Galke v. Duffy*, 645 F.2d 118, 120 (2d Cir.1981) (hearings on change in seniority dates impractical).

Accordingly, the decision of the district court is

AFFIRMED.